(No. 19647.—

THE UNITED STATES COLD STORAGE COMPANY, Defendant in Error, *vs.* THE CENTRAL MANUFACTURING DISTRICT BANK, Plaintiff in Error.

*Opinion filed April 23, 1931.*

504

WINSTON, STRAWN & SHAW, and LITSINGER, HEALY & REID, for plaintiff in error.

EUGENE P. KEALY, and FLOYD E. THOMPSON, for defendant in error.

BARBER & BARBER, BROWN, HAY & STEPHENS, EDWARD F. IRWIN, and CARL A. SORLING, (LOGAN HAY, of counsel,) amici curiæ.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The question to be determined in this case is whether a bank which has paid a check drawn upon it by one of its depositors, a corporation, payable to the order of a named person upon the forged indorsement of the payee, can successfully defend against the reimbursement of the depositor upon the ground that the check, after being prepared for execution under the direction of an employee of the corporation who furnished the name of the payee and the information for the voucher attached to the check but who was not authorized to sign the check separately or jointly with any other person, was presented by such employee to two other employees of the corporation who were authorized

to execute the check by signing it jointly, and did so execute it in reliance upon the information furnished by the first employee, and where it further appeared that the depositor was not indebted to the payee, and the check was not delivered to or indorsed by the payee but was cashed by another bank than that on which it was drawn, upon a forged indorsement of the payee's name, and was subsequently paid by the bank on which it was drawn. The action was assumpsit in the circuit court of Cook county by the United States Cold Storage Company against the Central Manufacturing District Bank to recover the amount of fifty checks drawn by the plaintiff on and paid by the defendant and charged to the plaintiff's account. At the close of the plaintiff's evidence the court instructed the jury to find a verdict for the defendant, upon which judgment was rendered. The plaintiff appealed to the Appellate Court, which reversed the judgment and rendered judgment against the defendant for $6148.97, the amount of the checks, with interest. The record has been certified to this court as a return to a writ of *certiorari.*

The plaintiff, a depositor in the bank, did an extensive business, had many customers and employees and issued many checks. The regular course of business with regard to drawing checks on the bank was that the checks were made out on a typing machine according to instructions given to the typist by the voucher writer. This was usually Arnold P. Meister, who was the plaintiff's chief clerk and had charge of the office. A carbon copy of each check was made and this copy was initialed by the department head, and on this initialing or O. K. the check was signed by the officials having authority to sign it. The checks that went through the office department came under Meister and on his initial or O. K. were signed. No further investigation was made by those signing except to see that on the voucher there was a memorandum of some sort showing who O. K.'d it. The information on the voucher was taken

from the books of the company. Meister was in the employ of the plaintiff from 1920 until October, 1924. The first of the checks involved in this suit was dated June 3, 1923, and the last, October 25, 1924. They were all prepared in the usual course of business by the typist under the direction of Meister, and were presented by him, with the voucher attached furnishing the information upon what consideration the check was based, to officers or employees of the plaintiff who were authorized to sign the check jointly. There were four officers or agents of the plaintiff who were authorized to sign checks and the signatures of two of the four were required upon each check. The checks were not signed unless accompanied by the duplicate voucher bearing the proper O. K. None of the agents signing the check had anything to do with its preparation or usually knew anything about it or the consideration for it except what appeared on the face of the voucher attached to it. When the check, with the voucher so attached, bearing the O. K. of the proper person, was presented, the agents were authorized to execute the check. The fifty checks in question here were drawn payable to seven different customers of the plaintiff, and the plaintiff at the time was not indebted to the respective payees. After the indorsements of the payees had been forged the checks were cashed through other banks than the defendant and were subsequently paid by the defendant, on which they were drawn. After the checks had been paid by the defendant Meister disappeared, and, so far as the record shows, has not since been seen.

It is well settled that the obligation of a bank to its depositor is to pay his checks, up to the amount of his deposit, according to his direction, and if that direction is to pay to a person named, or to his order, the bank must ascertain at its peril the identity of the person named as payee or the genuineness of the indorsement if the check is presented by an alleged indorsee. The defendant does not question this legal proposition, but bases its defense on the

claim that the checks were all payable to bearer because, as it says, they were payable to living persons not intended to have any interest therein, and so, under paragraph 3 of section 9 of the Negotiable Instruments law, were payable to bearer; and for this proposition it cites in its brief, *Bartlett* v. *First Nat. Bank*, 247 Ill. 490, and in its argument many other authorities. The foundation of its whole defense is, that the intent of Meister, the chief clerk, who presented the checks for signature and presumably received the money for them, was the intent of the plaintiff. These checks were all made payable to living persons, and if such living persons were not intended by the drawer to have any interest in them the checks were legally payable to bearer. Meister had nothing to do with drawing any one of these checks. He was simply one of the agents of the plaintiff in collecting the information upon which the check was based and caused the check to be prepared for signature. His intention in regard to the check was of no importance, for he had nothing to do with giving it vitality. Even if he was expected, as a messenger, to deliver the check to the payee, his intention to deliver or not to deliver it could not affect the character of the check. If there still remained the duty for him to perform of delivering the check to the payee by mail or otherwise, his intention to betray his employer, disregard his duty, steal the check and forge the payee's name would not become the intention of the plaintiff, whose agent he was only for certain limited purposes, which did not include the drawing of checks.

The case of *Bartlett* v. *First Nat. Bank, supra,* has no resemblance to this case. There Walsh, the faithless agent who drew the draft payable to a third person, to whom he never intended to deliver it, not intending that the payee should ever have possession of the draft or any interest in it, had complete authority to draw the draft against his employers, who were acquainted with his method of drawing drafts and getting the cash on them and had the benefit of

his acts in their business, knowing how he was conducting the business. The drafts, after being drawn by the plaintiffs' agent, were indorsed by him in the name of the payee and paid to him by the State Bank of Reddick, in Kankakee county, which indorsed and delivered them to the defendant, the First National Bank of Chicago, and the latter bank collected them of the plaintiffs, on whom they were drawn. The declaration consisted of the common counts, the general issue was filed, and the liability of the defendant was based upon its guaranty, by its indorsements of the drafts, of the genuineness of the payees' indorsements. The judgment in favor of the defendant was affirmed on two grounds: First, that the negligence of the employers was so great that they ought not, as a matter of law, to be permitted to recover from the bank the amounts of the drafts upon which the names of the farmer payees were forged by the agent, Walsh, the drawer of the drafts, who they knew was drawing drafts against them with which to obtain money from the bank to pay for grain which he was buying for their account and was wrongfully indorsing the names of the payees in whose favor the drafts were drawn, upon such drafts. They knew he was short upon grain which he had purchased for them, and they also knew that he persisted in drawing drafts and indorsing them in the names of the payees after they had forbidden him to do so, and knowing these things they retained him in their employ and permitted him to continue drawing and indorsing such drafts without informing the banks which were handling such drafts of the fact that Walsh was wrongfully indorsing them. The employers were therefore held responsible for the drafts so drawn and indorsed, on the principle that when one of two innocent parties must suffer loss by reason of the wrongful acts of a third person, the one who by reason of his negligence has made it possible for the third party to commit the wrong must stand the loss. Second, the drafts were drawn by the plaintiffs

at Reddick, payable to persons residing in that locality, by their agent there, upon themselves in Chicago, and being so drawn by an agent authorized to issue them and in accordance with his practice, known to the plaintiffs, of drawing drafts upon them with which to obtain money from the banks to pay for grain which he was buying for their account, with the intention that such drafts should not be delivered to the payees named in the drafts and that the payees should have no interest in them, and of himself wrongfully indorsing the names of the payees on such drafts, the court further held they were in law payable to bearer, citing *Phillips* v. *Mercantile Nat. Bank,* 140 N. Y. 556, and *Snyder* v. *Corn Exchange Nat. Bank,* 221 Pa. 599. In both of these cases, as well as in the *Bartlett case,* the drawer of the check was an agent fully authorized to draw it, and in the latter case the court said: "The intent of the drawer of the check in inserting the name of the payee is the sole test of whether the payee is a fictitious person, and the intent of the drawer of these checks, as attorney for the appellant, must, as just stated, be regarded, as against the bank upon which they were drawn, as the intent of the appellant himself."

The checks involved in the *Phillips case* were drawn by the cashier of the National Bank of Sumter, in South Carolina, upon the Mercantile National Bank, the New York correspondent of the Sumter Bank. There were twelve of the checks, and they were drawn payable some to the order of A. S. Brown and the others to the order of C. E. Stubbs, who were residents of Sumter and customers of the bank but knew nothing of these checks and had no connection with the transactions of the cashier in connection with the issuing of them. The cashier, after drawing the checks, indorsed them in the names of the payees to a firm of stock brokers in New York, who collected them from the bank on which they were drawn. By manipulation of the books of the bank the cashier was able to prevent discovery of

his acts until after the bank's insolvency and his absconding. The receiver of the Sumter Bank having sued the Mercantile Bank for the amount of the checks was defeated in the trial court, and the judgment was affirmed by the New York Court of Appeals. It was held that the payees were fictitious persons in the eye of the law, and the cashier being invested with authority to draw checks upon the bank's correspondents it was within the scope of his powers to bind the bank by his checks, and having made the checks payable to the order of persons who had no interest in them and written their names under a direction to pay the real parties who were intended to be the recipients of the funds drawn upon, the bank was bound by his act and his intention and the checks were legally payable to bearer.

*American Hominy Co.* v. *Bank of Decatur*, 294 Ill. 223, is in all respects the same as *Bartlett* v. *First Nat. Bank, supra.* Like the latter case, it was an action to recover from a collecting bank the amount paid by the drawee of several drafts on the ground that the indorsement by the payee was forged. The circumstances of the drawing of the drafts were the same as in the *Bartlett case.* The agent who drew the drafts was engaged in buying grain for the plaintiff and was authorized to pay for the grain by drawing drafts on it. The drafts involved in the suit were not drawn and delivered to the payees named in payment of grain or for any other purpose, but the name of the payee in each draft was indorsed on the draft by the agent without the authority or knowledge of the payee. The drafts were then delivered to a commission firm in Decatur in payment of transactions covering the agent's personal deals with the commission firm, and in due course these drafts were delivered to the defendant, the Bank of Decatur, for collection and were paid by the hominy company to the bank. The opinion of the court followed that in the case of *Bartlett* v. *First Nat. Bank, supra,* and it was held that the general agent of the corporation being authorized to buy all the grain that was

to be bought from farmers in his vicinity and to pay for it by drawing drafts on the corporation, the drafts were in legal effect the promissory notes of the corporation; that the act of drawing such drafts in favor of fictitious persons and indorsing the names of such persons was within the apparent scope of the agent's authority and the corporation was therefore bound by his acts, and that the drafts so drawn were in legal effect payable to bearer and the bank which collected the drafts was not liable to the drawee which paid them.

In accordance with the principles announced in these two cases it seems clear that the payees of the checks in question were not fictitious. An instrument is payable to a fictitious payee only when payable to the order of a person known to the drawer or maker to be fictitious or non-existent or of a living person not intended to have any interest in it. The seven payees of these checks were living persons, known by the officers who signed the checks to be customers having business relations with the plaintiff and believed to be creditors of the plaintiff, to whom the checks were issued for the supposed amounts due them. The checks were therefore not payable to bearer and title to them could not be acquired except through the indorsement of the respective payees, and they were not indorsed. There is no defense to this case unless it appears that it was the intention of the United States Cold Storage Company, the drawer of the checks, that they should not be delivered to the respective payees and that the payees should have no interest in them. How was such intention to be shown? It might have been by resolution of the board of directors stating it, but, of course, no such resolution would ever be passed, and the only way of proving such intention would be by such acts, conduct and language of persons having the authority and right to draw the checks or to control their delivery as evinced the intention. This is what was done in the *Bartlett* and *American Hominy Co. cases, Phil-*

*lips* v. *Mercantile Nat. Bank* and *Snyder* v. *Corn Exchange Nat. Bank, supra,* the decisions in all of which were based upon the general authority of the officers or agents drawing the instruments in those cases to indorse such instruments and bind their principals. The converse of the rule, that without such general authority the intention of the agent is not binding on the principal, is equally true. It is unreasonable that the intention of the corporation or the partnership or the individual employer should be sought for in the intention of any subordinate employee who has no authority to issue a check, draft or other negotiable instrument. There may be many employees—shipping clerks, messengers, checkers, book-keepers, superintendents, managers of departments and others—whose duties are necessarily concerned in the receipt, care, sale and delivery of goods, in the doing of work, in the keeping of accounts and in the determination of the amounts due from debtors or to creditors of any mercantile, manufacturing or commercial establishment, whose work is all subject to the final control of the responsible officers to whom are committed the duty and responsibility of direction, final decisions and action. In this case Meister had no authority to draw a check or direct the drawing of a check. He merely furnished data as a basis to justify the drawing of checks by those who were authorized to do so. He collected the necessary data to show the propriety of drawing a check in favor of any individual and caused a check to be prepared for execution by the proper persons, to which was attached the information thus brought together, and that was as far as his duty extended. By his O. K. he approved the check with the voucher attached. The document then went to the desks of the persons who were authorized to issue the check, and in the regular course of business the check was examined, and, if sustained by the data attached, was signed by the persons authorized to sign and issue it. Their intention might be said to be the intention of the corporation.

This case differs in its circumstances, but not in the principles involved, from the *Bartlett* and *American Hominy Co. cases,* and the rules which must control its decision have been decided in many cases, with varying circumstances, in other States.

Out of the relation of debtor and creditor existing between banks and their depositors, the law implies the contract on the part of the bank to pay the depositor's checks, to the amount of his deposit, to the persons to whom he orders payment to be made. If the check is made payable to the order of a person named, the duty of the bank is absolute to pay only to the payee or according to his order. No amount of care to avoid error will protect the bank from liability if it pays the check to a wrong person, and it must ascertain and act upon the genuineness of the indorsement at its peril. *Jordan-Marsh Co.* v. *National Shawmut Bank,* 201 Mass. 397; *Welsh* v. *German-American Bank,* 73 N. Y. 424; *Critten* v. *Chemical Nat. Bank,* 171 id. 219; *Seaboard Nat. Bank* v. *Bank of America,* 193 id. 26; *Armstrong* v. *Pomeroy Nat. Bank,* 46 Ohio St. 512; *Jackson* v. *National Bank of McMinnville,* 92 Tenn. 154.

The negligence of the drawer of a check is immaterial, unless it is such as directly and proximately affects the conduct of the bank in the performance of its duties. (*Jordan-Marsh Co.* v. *National Shawmut Bank, supra; Shepard & Morse Lumber Co.* v. *Eldridge,* 171 Mass. 516; *Welsh* v. *German-American Bank, supra; Shipman* v. *Bank of the State of New York,* 126 N. Y. 318; *Los Angeles Investment Co.* v. *Home Savings Bank,* 181 Cal. 680.) A bank can justify a payment on a depositor's account only upon the actual direction of the depositor. The questions arising upon checks between the drawee and the drawer "always relate to what the one has authorized the other to do. They are not questions of negligence or of liability of parties on commercial paper but are those of authority, solely. * * * The question of negligence cannot arise unless the depositor

has, in drawing his checks, left blanks unfilled or by some affirmative act of negligence has facilitated the commission of a fraud by those into whose hands the check may come." (*Crawford* v. *West Side Bank,* 100 N. Y. 50.) The payment of a check on a forged indorsement appearing, it becomes incumbent on the bank making the payment to establish affirmatively the drawer's negligence, and it is not the law that the drawer is bound to prepare his check so that nobody can successfully tamper with it. (*Critten* v. *Chemical Nat. Bank, supra.*) Nor does he owe the duty to his banker to employ none but honest clerks who will not steal his checks and commit forgeries by means of them. When he has drawn his check payable to the order of the payee named he owes the drawee no other duty, and the risk of the authenticity of the indorsement on which the drawee pays the check is that of the drawee.

These fifty checks were all drawn in the regular course of the plaintiff's business, by the agents of the plaintiff duly authorized to draw checks, and were made payable to actual customers of the plaintiff for debts supposed by the plaintiff's agents who drew the checks to be actually due to such customers, this supposition being based upon information received by such agents in the regular course of the plaintiff's business through the regular channels. They had the same validity as any other check which might be drawn by the plaintiff's authorized agents in the course of the plaintiff's business, and if the defendant had paid them, in accordance with the plaintiff's direction, upon the indorsement of the payees, they would have been properly charged against the plaintiff's account. They were all made in reliance upon the information derived by the officers drawing the checks from other agents of the corporation through the system adopted by it for checking, receiving, shipping, receipting, keeping account of and paying for goods and services received, rendered and delivered. The facts are similar to those involved in the case of *Los Angeles In-*

*vestment Co.* v. *Home Savings Bank, supra.* There the plaintiff, a corporation, had varied and extensive business, including real estate and fire insurance, the different departments of which were conducted by department managers. F. R. Emory was manager of the fire insurance department, and the business of this department required the constant making of disbursements, which were made by checks. Emory had no authority to sign checks, but the method of making disbursements for his department was that he made a requisition on the accounting department for the payment, showing what it was for and to whom it was to be made. That department examined the requisition and if it was found correct approved it and entered it on the plaintiff's books. A check was then prepared and presented to the officer authorized to sign checks. After being signed it was returned to the insurance department, to be delivered to the person to whom the payment was due.. The system was in no material respect different from that of the plaintiff in this case. Emory, beginning on February 17, 1914, and ending on September 11, 1915, prepared a series of twenty requisitions for checks in payment of pretended claims which had no existence. Several of them were in a wholly fictitious name and the rest in the name of a person known to Emory, who was wholly ignorant of the checks and to whom Emory had no intention of making any payment. The demands in some cases were for the return of premiums and in others in settlement of premiums collected by the company. The checks were signed in accordance with those requisitions and returned to Emory for delivery to the payees. Emory indorsed them in the name of the payees, then in his own name and collected them by presentation to the payees or through other banks. Besides these twenty checks there was one which was based on a genuine demand and was made payable to a genuine creditor as payee, which Emory, instead of delivering, collected himself by forging the payee's indorsement. The

opinion disposed *seriatim* of the five defenses alleged. In regard to the defense of a want of negligence on the part of the bank it was held immaterial since the case was simply one of a forged indorsement, and the risk was upon the bank no matter what degree of care was exercised. In regard to the second defense, that the payees were fictitious, it was held that they were not, because it was not the intention of Emory, who did not execute the checks and had no authority to do so, but the intention of the officers who did draw the checks, which must be taken to be the intention of the company. They did not intend to execute checks to fictitious payees but to existing persons. It was said: "Nor is the company bound by the guilty knowledge of Emory. That knowledge was adverse to his company and such as in the nature of things he would not communicate to it. It is elementary that a principal will not be charged with knowledge of an agent under such circumstances. [Citing *Henry* v. *Allen,* 151 N. Y. 1, and *United Securities Life Ins. and Trust Co.* v. *Central Nat. Bank,* 185 Pa. 586.] This, of course, is very different from an agent binding his principal by acts done within the scope of his authority although done with knowledge and intent adverse to his principal, and we have no intention of saying that an agent may not bind his principal under such circumstances. It may well be that in this case, if Emory had had authority to draw checks and had drawn these particular ones, making them payable to fictitious payees, his intent in this respect would in legal effect, as to third persons, be the intent of the company although such intent was adverse to the company and part of a scheme to defraud it. But charging a principal with knowledge merely because such knowledge is possessed by an agent and charging him with acts done by the agent within the scope of his authority are not the same thing, and it is only in the latter case that the principal may be bound by the uncommunicated information or intent of the agent when such

information or intent is hostile to the principal. The point in this case is that the checks were not executed by the guilty agent. We are not concerned with an act done by him within the scope of his authority, and therefore his guilty intent and knowledge are not the intent and knowledge of his principal. The intent and knowledge of the principal was, as we have said, that of the officers who drew the checks, and they were wholly innocent of any intention of drawing checks to fictitious payees." Sustaining these views the opinion cites many cases, among them *Shipman* v. *Bank of the State of New York, supra, Jordan-Marsh Co.* v. *National Shawmut Bank, supra, Phillips* v. *Mercantile Nat. Bank, supra,* and *Snyder* v. *Corn Exchange Nat. Bank, supra.* In referring to the last two cases it is said that the facts in them were much the same as in the case at bar, with the very important exception that the dishonest employee had authority to draw checks and did himself draw the very checks in question, and in both cases the decision was put upon this ground and distinguished on this ground from *Shipman* v. *Bank of the State of New York.*

Meister's authority did not extend to requiring checks to be issued to any particular payee. He could only present the evidence upon which the persons having authority might issue checks, together with the check prepared for execution, but until executed by an authorized person this paper had no more force than a printed blank form of a promissory note. When it was signed it then became a check, and there is no evidence of any intention on the part of anyone that any of the checks in question should have any effect other than that apparent on their face, that they should be delivered to the respective payees in payment of debts due them. What relation Meister had to these checks after they were signed by those who were authorized to sign them does not appear from the evidence. How they came to his possession or for what purpose, and, if they did, how he disposed of them, is not shown. It seems to be assumed

that after their execution the checks did come to his possession and that he forged the indorsements ·of the payees and cashed the checks, and that after passing through various hands they were paid by the defendant and charged to the account of the plaintiff. Accepting these assumptions as in accordance with the facts, it does not appear that Meister could have had any further authority after the unsigned checks, together with the vouchers which he had O. K.'d, reached the desks of those authorized to execute them, than to receive them after their execution and deliver them to the payees. If this was the fact, and if instead of delivering the checks, as it was his duty to do, he abandoned his agency and disregarded his duty, and, converting the checks to his own use, forged the names of the payees, cashed the checks and received and appropriated the proceeds to his own use, his acts were neither within the scope of his authority nor in the course of his employment. If the question of the negligence of the plaintiff is to be considered there is no evidence of negligence on the part of the plaintiff in regard to these checks, certainly none which induced or contributed to the payment of these checks by the bank. Quoting again from *Los Angeles Investment Co.* v. *Home Savings Bank, supra:* "We are much inclined to the opinion that negligence cannot be reasonably inferred from the probative facts in this case. The company had rather an elaborate system of approving, checking and entering demands before checks were drawn to pay them. It was, as we have said, very similar to the systems found in other large corporations. Complaint is chiefly made that the company relied upon the honesty of its heads of departments and the regularity on their face of the demands or requisitions which such heads approved, and made no investigation to determine whether such demands were fraudulent or not. But trust must be placed in someone, (*Kohn* v. *Sacramento Electric, Gas & R. Co.* 168 Cal. 1, 141 Pac. 626; *Yamato* v. *Bank of Southern California*, 170 Cal. 351, 149

Pac. 826;) and necessarily in heads of departments. If trusting them in regard to demands for checks for disbursements regular upon their face is negligence, so it would be negligence to trust them in a hundred other ways in which it is within their power to defraud their employer. Business could not be conducted on any such basis. It is impossible for any large concern to investigate minutely in advance every demand for disbursement necessary for it to make in its daily business. The delay and expense of so doing would be too great. But however this may be, even if the company were guilty of negligence in signing the checks upon the fraudulent demands of Emory, it is plain that such negligence did not contribute to or induce the acceptance by the banks of the forged indorsements. The forgery of the indorsements was entirely distinct from the issuance of the checks on false demands, and there was no relation between them."

This question of the proximate cause of the payment of the checks by the defendant on the forged indorsement is also discussed in *Jordan-Marsh Co.* v. *National Shawmut Bank, supra,* where the following language is used: "If one is fraudulently induced to deliver to a person who is not entitled to it a check made payable to another person who is not entitled to payment of it, can his negligence in suffering the fraud to be practiced upon him be found to be a direct and proximate cause of a payment made by the banker on whom the check is drawn, upon a forged indorsement of the name of the payee, without any investigation by the banker as to the genuineness of the indorsement? We think not. The check is like any other check payable to a real person which happens to be in the possession of another person. It is possible to forge an indorsement upon it as it is to forge an indorsement upon any other check. Perhaps the circumstances make a speedy detection of such a forgery less probable than in ordinary cases. But the whole duty of seeing whether there is a forgery of such an

indorsement upon any check rests primarily upon the banker. The drawer of the check has nothing to do with that. Ordinarily he makes no representation that has any relation to it. In the case just supposed he made no representation in regard to it. The checks payable to the order of A. L. Sefton, which she did not indorse, were wrongly paid, and the defendant's liability for payment is like that for the payment of any other check bearing such a forged indorsement. The plaintiff had nothing to do with the payment or with the defendant's performance or non-performance of its duty to see that payment was made to the right person."

Neither is the plaintiff to be charged with any notice of Meister's intention not to deliver the checks to the payees, nor with his knowledge that he had not done so but had forged the indorsements and disposed of the checks. His intention not to deliver the checks was of no importance, because he had nothing to do with the checks after they were placed on the desks of the officers to be executed, except possibly to deliver them to the payees, and his intention not to deliver them cannot be imputed to the corporation, the plaintiff, contrary to the intention of the drawers of the checks. If it was his duty to deliver them, his intention not to deliver them could not be imputed to his employer any more than the intention of any other messenger it might employ—an expressman, or a district messenger boy, or a special messenger. The general rule that notice to an agent, while acting for his principal, of facts affecting the character of the transaction is constructive notice to the principal, is subject to an exception when the agent is engaged in committing an independent fraudulent act on his own account and the facts to be imputed relate to this fraudulent act. *Allen* v. *South Boston Railroad Co.* 150 Mass. 200; *Henry* v. *Allen, supra; Benedict* v. *Arnoux,* 154 N. Y. 715; *Terrell* v. *Branch Bank of Mobile,* 12 Ala. 502; *American Surety Co.* v. *Pauly,* 170 U. S. 133.

The circuit court erred in instructing the jury, at the close of the plaintiff's evidence, to find a verdict for the defendant. The Appellate Court properly reversed the judgment but it was error to render judgment against the defendant. The defendant pleaded the general issue, under which it had the right to introduce evidence in contradiction of that introduced by the plaintiff, and it had. a right to a trial by jury of the issue. The cause should have been remanded to the circuit court.

The judgments of the Appellate Court and of the circuit court are reversed and the cause is remanded to the circuit court for a new trial. *Reversed and remanded.*