Madison and Kedzie State Bank for the Use of Globe Indemnity Company, Appellee, v. Madison Square State Bank, Appellant.

Gen. No. 35,722.

Opinion filed May 24, 1933. Rehearing denied and opinion modified June 7, 1933.

DENT, WEICHELT & HAMPTON, for appellant.

DEFREES, BUCKINGHAM, JONES & HOFFMAN, for appellee; DON KENNETH JONES and ROBERT E. WRIGHT, of counsel.

Mr. Justice Hebel delivered the opinion of the court.

This action is for the recovery of money paid by the plaintiff to the defendant upon plaintiff's nine cashier's checks amounting to $39,200, during the month of October, 1929, which had been deposited with or cashed by the defendant. Upon a directed verdict by the court in favor of the plaintiff, for use of the Globe Indemnity Company, upon a loss paid by it to the plaintiff, judgment was entered in the sum of $42,956.63, from which judgment the defendant appeals to this court.

The nine cashier's checks issued by the Madison & Kedzie State Bank in the aggregate sum of $39,200, were each made payable to S. Williams and so indorsed. In June, 1929, the cashier's checks were deposited in the defendant bank and the amount was credited to the account and in the name of E. S. Hempy or James F. Hogan. These cashier's checks passed through the Chicago Clearing House and were paid by the Madison & Kedzie State Bank through this agency to the defendant, and the defendant in turn credited the account with the amount above mentioned. This amount was withdrawn by the checks of the depositors, except a small sum still on deposit in the account with the defendant bank. It also appears that one Frank Culliton was employed by the plaintiff bank as a collection teller in charge of its collection department, whose duty it was to keep a record of items left with the bank for collection, to receive payments on account of said items, to make proper entries in the books of the bank regarding such transactions, and to procure a cashier's check for the amount of each item collected payable to the person on whose behalf the collection had been made, and deliver such check to the person entitled thereto. When in the course of business of the bank it became necessary to make a

remittance, the collection teller would prepare a requisition on a form used by the plaintiff bank, which would contain the name of the payee and the amount of the check. The collection teller would deliver this requisition to the draft teller, who would cause a cashier's check for the signature of an officer authorized to sign a check to be prepared by a girl employed by the plaintiff bank. After the check had been prepared for signature, the draft teller would write his initials in the center of the lower margin on the face of the check, to identify it as a bank transaction. The draft teller would then indorse on the requisition opposite the name of the payee the number of the cashier's check which he had prepared pursuant to the requisition. For this purpose he usually entered the last three digits of the check number. The draft teller would then deliver the check to the collection teller, who would take it to an officer of the bank who was authorized to sign it, and obtain his signature. The cashier's check would then be delivered by the collection teller to the person entitled to receive it.

It appears from the evidence that during the month of February, 1929, Culliton began to take money from the plaintiff bank and to use it to make wagers on the results of horse races, with various bookmakers. Culliton embezzled this money by using the cashier's checks obtained by the method in practice in his department to collect and pay money due customers of the bank. Instead of cashier's checks being prepared to pay the collection, Culliton would issue a requisition for a cashier's check, payable to one S. Williams, following the usual method herein set forth, and use the checks or money received therefrom to gamble. Culliton made bets on horse races with one Edward McEvoy, a gambler who operated a cigar store at 17 South Cicero avenue, Chicago, and had in his employ Steve Hempy. Between the 2nd and 21st of October,

16

1929, inclusive, McEvoy received from Culliton nine cashier's checks issued by the plaintiff bank, aggregating the sum of $39,200, payable to the order of S. Williams. Before Culliton began using cashier's checks he was instructed by McEvoy to have the checks made payable to S. Williams. The checks in question were delivered to either McEvoy or Hempy and the money so obtained was used in making bets on horse races. All of these checks were indorsed and deposited in the defendant bank and credited to the E. S. Hempy or James F. Hogan account. When the cashier's checks were presented for deposit with the defendant, the checks were made payable to the payee named, and indorsed. The checks were issued by the plaintiff bank, passed through the Chicago Clearing House for collection by the defendant, and paid by the plaintiff, and the defendant credited the deposit account of Hempy in the usual course of business. The defendant followed the usual procedure in the collection of checks deposited in the bank by depositors. It is equally true that the defendant adopted the course usually practiced by banks when collections were made through the Chicago Clearing House in the interchange of check collections. Up to this point the defendant did not do anything that every other financial institution had not done in the usual course of business, and its conduct is not subject to criticism.

The question arises, is the defendant chargeable with knowledge of facts which would indicate that fraud was practiced upon the plaintiff bank by one of its employees, and because of the fraudulent practice is the name of the payee in each of the cashier's checks a fictitious person within the provisions of section 9 of the Negotiable Instruments Act, Cahill's St. 1931, ch. 98, ¶ 29. The act provides, in part, that such instrument is made payable to bearer—

"When it is payable to the order of a fictitious or non-existent or living person not intended to have any interest in it, and such fact was known to the person making it so payable, or known to his employee or other agent who supplies the name of such payee."

The defendant claims that the cashier's checks involved were the plaintiff's checks; that by issuing them the plaintiff admitted the existence of the payee S. Williams and his capacity to indorse such checks; that the checks were delivered to the defendant for value and in good faith and without any infirmity in the instrument or defect in the title, or notice of such, and therefore the defendant was the holder in due course; that there is no evidence whatever that the indorsement was not in the handwriting of the payee, or not authorized. The defendant in support of the above contention calls the attention of the court to section 60 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 80, which is as follows:

"The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse."

The defendant also cites section 61 of the same act, Cahill's St. ch. 98, ¶ 81, as having a material bearing upon the question in this case. This section is as follows:

"The drawer by drawing the instrument admits the existence of the payee and his then capacity to indorse, and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any indorser who may be compelled to pay it. But the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder."

The legal effect of a cashier's check issued by a bank is the same as a bill of exchange drawn by the bank upon itself and accepted in advance by the act of its issuance, and is not subject to countermand like any ordinary check. The relations of the parties to such an instrument are analogous to those of the parties to a negotiable promissory note, payable on demand. Banks and Banking, 7 C. J. 702. Such check is accepted in the commercial world as a promise by the bank to pay the amount, and in the usual course of business such check is accepted in payment of amounts due arising from transactions between parties. The bank as maker of this negotiable instrument engages that the bank will pay according to its terms, and admits the existence of the payee named and his capacity to indorse, so that the responsibility for the issuance of the cashier's check is the bank's, and it is not a defense that its employees were negligent in the issuance of the check received by a holder in due course without knowledge or notice of any infirmity. The cashier's checks in the instant case were issued by the plaintiff bank through its agent and later deposited in the defendant bank by a depositor. The checks were received by this bank in due course of its business. The evidence fails to establish that the defendant had any knowledge of the fraud which was practiced upon the plaintiff by its employees. It is quite true that the plaintiff bank acts through its agents and must rely upon their integrity in carrying out its banking business, but the difficulty in operating this bank does not excuse the issuance of the cashier's checks in question. These checks were received for deposit by the defendant bank in the regular course of business and paid through the Chicago Clearing House, which justified the defendant in paying the withdrawal by the depositor of the fund, and the defendant should not be made to pay again the sum rep-

resented by the cashier's checks issued by the plaintiff bank.

If the rule were otherwise, the receipt of a cashier's check would require the holder to ascertain whether the issuing bank had a defense. This would retard business and it would always be a question as to the advisability of the acceptance of cashier's checks.

In this case the plaintiff bank cashed five cashier's checks issued by it and signed under similar circumstances, payable to the same payee, S. Williams. These checks passed through the hands of the bank tellers of this bank. It appears that Culliton's O. K. of the indorsement, in the main, induced the paying tellers to pay the money to the holder.

The plaintiff in reliance on its position in this case, calls the attention of the court to the case of *U. S. Cold Storage Co. v. Central Mfg. Dist. Bank,* 343 Ill. 503, as decisive upon the questions involved in this litigation. The opinion of the Supreme Court in that case is controlling in many respects and is binding upon this court upon such questions. It is to be noted, however, that the question of negligence of the plaintiff bank which contributed to or induced the acceptance by the defendant of the plaintiff's cashier's checks for deposit and subject to withdrawal, is an important element to be considered in determining whether such negligence exists.

In passing upon the question when the acts of the agent for the principal may be binding, the court in the case of *U. S. Cold Storage Co. v. Central Mfg. Dist. Bank, supra,* said:

"This, of course, is very different from an agent binding his principal by acts done within the scope of his authority although done with knowledge and intent adverse to his principal; and we have no intention of saying that an agent may not bind his principal under such circumstances. It may well be that in this

case, if Emory had had authority to draw checks and had drawn these particular ones, making them payable to fictitious payees, his intent in this respect would in legal effect, as to third persons, be the intent of the company although such intent was adverse to the company and part of a scheme to defraud it.''

And upon the question of the payment of depositor's checks, the Supreme Court had this to say:

''Out of the relation of debtor and creditor existing between banks and their depositors, the law implies the contract on the part of the bank to pay the depositor's checks, to the amount of his deposit, to the persons to whom he orders payment to be made. If the check is made payable to the order of a person named, the duty of the bank is absolute to pay only to the payee or according to his order. No amount of care to avoid error will protect the bank from liability if it pays the check to a wrong person, and it must ascertain and act upon the genuineness of the indorsement at its peril. *Jordan-Marsh Co. v. National Shawmut Bank,* 201 Mass. 397; *Welsh v. German-American Bank,* 73 N. Y. 424; *Critten v. Chemical Nat. Bank,* 171 id. 219; *Seaboard Nat. Bank v. Bank of America,* 193 id. 26; *Armstrong v. Pomeroy Nat. Bank,* 46 Ohio St. 512; *Jackson v. National Bank of McMinnville,* 92 Tenn. 154.''

But the rule is different as to the rights and duties of the maker in the issuance of a cashier's check. The statute on negotiable instruments provides that the maker of a negotiable instrument engages that he will pay according to its tenor, and admits the existence of the payee and his capacity to indorse. The issuance of the plaintiff's cashier's checks and the indorsement that appears upon the checks by the payee, and the payment by a third party who is the innocent victim, is quite different from the rule that applies to the payment by a bank of its depositors' checks. In the instant case there was no fraud that goes to the execu-

tion of the check; but the fraudulent conduct of the plaintiff's employee goes only to the question of its consideration, and the question of consideration is not a matter of defense against the defendant, who is a holder in due course, without notice of any infirmity. Section 28 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 48. This defense would not be available to the plaintiff in an action by the defendant to recover money paid by it on the faith of plaintiff's cashier's check.

One further question called to our attention by the plaintiff is that the payee named S. Williams was a fictitious or non-existent person, and that this fact was not known to the plaintiff when it issued the checks; that the indorsement of the name of the payee was unauthorized and passed no title to the defendant.

The evidence upon this phase of the case is that Culliton and McEvoy agreed that the cashier's checks were to be issued and made payable to S. Williams, and delivered to McEvoy, which raises the reasonable inference that McEvoy assumed this name for reasons of his own, and deposited the checks with the defendant, properly indorsed. This question is largely one of fact, and the conclusion that we have reached is largely substantiated by the cashing of certain of these checks by the plaintiff bank payable to S. Williams and so indorsed, also upon the face of which appeared the O. K. of Culliton and upon whose O. K. the paying tellers paid the amount called for by the checks to the holders. In fact, when one of such checks so approved by Culliton was presented to one of the paying tellers of the plaintiff bank, the teller called it to Culliton's attention and he indicated that the check was properly indorsed, and thereupon the teller paid the money to the holder. This act of Culliton would indicate that he had authority to authorize the payment of checks by the tellers of the bank and that in this matter he acted within the scope of his authority.

This case upon the facts is well within the rule that when one of two innocent parties must suffer loss by reason of the wrongful acts of a third person, the one who by reason of his negligence has made it possible for the third party to commit the wrong must stand the loss.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

WILSON, P. J., and HALL, J., concur.