**AMERICAN SURETY CO. OF NEW YORK
et al. v. BANK OF CALIFORNIA.**

No. 265.

District Court, D. Oregon.

Dec. 23, 1941.

82

Cake, Jaureguy & Tooze, Plowden Stott, E. L. McDougal, Randall S. Jones, and Maurice D. Sussman, all of Portland, Or., for plaintiffs.

McCamant, Thompson, King & Wood and Robert Miller, all of Portland, Or., for defendant.

JAMES ALGER FEE, District Judge.

This action was brought by American Surety Company of New York, a New York corporation, and E. L. McDougal, a citizen and resident of the State of Oregon, to recover amounts paid by the defendant upon checks carrying forged endorsements. Defendant "The Bank of California, National Association", is a corporation organized and existing under and by virtue of the National Banking Laws of the United States. "The place where its banking house or office shall be located and its operations of discount and deposit carried on and its general business conducted shall be the City and County of San Francisco with branches at Portland, Multnomah County, Oregon * * * 1".

The Interior Warehouse Company,[2] an Oregon corporation, doing business in Portland, was a depositor between October 2, 1935, and May 1, 1939, in the Portland branch of defendant bank, and during all of this period maintained a deposit in excess of the amounts hereinafter shown to have been improperly paid out. Crowe, a bookkeeper of the Interior, prepared but did not sign checks to cover pay-rolls and other incidental expenses. He conceived the scheme of writing additional checks upon defendant bank, either to persons on the pay-rolls in sums beyond what was actually due them, or to non-existing persons, and of obtaining the money thereon by forging the name of the supposed payee. He carried this out successfully over a period of years, forging the endorsements, and generally cashing these checks with Meier & Frank Company, a mercantile establishment in Portland, or with some individual. Crowe was not authorized to sign checks for the Interior, since this authority was vested only in two other employees. Neither of these men knew or suspected the scheme of Crowe, or the forging of the endorsements on the checks which they signed. Crowe compared the bank statements and returned checks with the records upon their receipt by Interior, and was thus able to delay detection. On trial, Crowe testified as to nineteen checks, the originals of which had been destroyed, that he had drawn the latter to fictitious payees and forged the endorsements thereon. The bank objected to the proof of these lost documents.

The American Surety Company of New York and the underwriters at Lloyds in London[3] (assignors of E. L. McDougal), had written policies of insurance by which the employees of Interior, including Crowe, were bonded, and Interior insured against the loss it might sustain by reason of dishonesty of any of these employees. Interior procured and paid for these policies. No insurance was taken by Interior upon its checks, nor indemnity thereon for loss by reason of forgery.

On October 16, 1939, Interior and insurers notified defendant that payments on these checks were unauthorized. Thereafter the insurers paid Interior the full amount of the loss caused by the dishonesty of its employee, and accepted assignment of any rights which Interior might have against the Bank. This action was then brought for $6,562.33, the amount of the loss thus paid. The Bank contended that diversity of citizenship between it and each of the plaintiffs did not exist. The court overruled the motion based on this con-

---

[1] Excerpt from Article Second of Articles of Association of defendant hereinafter called the "Bank".

[2] Hereinafter called "Interior".

[3] Hereinafter generally designated as the "insurers".

tention. The cause came on regularly for trial before the court, sitting without a jury, based upon a pre-trial order which fully set out the issues and listed the documentary evidence.

At the outset the jurisdictional point must be met. The Bank contends that it is a citizen of Oregon by virtue of its operation of a branch in this state. The defendant is a corporation formed under the federal banking laws of general application. Formerly, it was a state bank of California and was thus enabled as a "mother bank" to carry its branches into the federal system.[4]

The history of legislation relating to national banks indicates that the statutes contemplate that such an institution shall have situs in one state [5], and that jurisdiction of a federal court attaches under the ordinary rules as to diversity of citizenship based on that assumption [6]. Federal jurisdiction is not any longer based upon the fact of federal incorporation of a bank [7]. Nor has the opposite view been adopted by Congress, namely, that such incorporation carries with it citizenship in each state of the Union. The intent of the statutes is to steer a middle course and to confer upon a national bank the right to come into or remove a cause to a United States court in common with private corporations invested with powers by the several states [8]. The state of incorporation is the criterion of residence and citizenship of corporations authorized by the laws of the various states [9]. Congress intended that analogous tests should be applied in cases of entities endowed with existence by federal power. The principal place of business is the distinguishing factor. Dual incorporation has not been the rule with corporations organized in the various states [10], probably because the right to go into a federal court outside the state of incorporation might be thereby lost.

The whole doctrine of diversity of citizenship of corporations is founded upon a judicial fiction [11] of extremely technical character. Reasoning from such artificial premises is illusory. In view of the historical sanction, it is believed Congress used the doctrine as a foundation for the enactments relating to national banks. Although, then, the modern tendency has been to limit jurisdiction based on diversity of citizenship actual or implied, no hardship or inconvenience is discovered in the application of a rule analogous to that of state corporations [12]. Therefore, until the entire foundation crumbles, a national bank should be considered as a citizen of the state where it has its principal place of business, irrespective of the fact that it has authorized branches in other states. A state corporation carries on business in many states and may have branches widely scattered, yet it is a citizen of the state where it is incorporated. The court has jurisdiction, because the Bank must be viewed as a citizen of California. Questions of venue were waived.

An examination of the merits is now required. These is no binding authority in the state of Oregon upon the exact situation here presented. Many authorities have been cited from other jurisdictions. But calculation of numerical weight of authority from other jurisdictions will not suffice. This court must attempt to give weight to the considerations which, judged from previous utterances, will affect the Supreme Court of Oregon, when that tribunal deals with a state of facts such as is here presented.

4 The Act of Mar. 3, 1865, c. 78, § 7, 13 Stat. 484. This Act was amended in 1927 to permit national banks subsequently created to maintain branches. 12 U.S.C.A. § 36.

5 12 U.S.C.A. §§ 22, 81.

6 28 U.S.C.A. § 41, subd. (1) and (16).

7 28 U.S.C.A. § 41, subd. (16) note 6.

8 Continental National Bank of Memphis v. Buford, 8 Cir., 191 U.S. 119, 24 S.Ct. 54, 48 L.Ed. 119.

9 St. Louis Nat. Bank v. Allen, C.C. Iowa, 5 F. 551; Fulton National Bank of Atlanta v. Hozier, 5 Cir., 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609; New England Nat. Bank of Kansas City v. Calhoun, 8 Cir., 9 F.2d 272.

10 See St. Louis & San Francisco Railway Company v. James, 8 Cir., 161 U.S. 545, 16 S.Ct. 621, 40 L.Ed. 802; Southern Railway Company v. Allison, 190 U. S. 326, 23 S.Ct. 713, 47 L.Ed. 1078.

11 Bank of the United States v. Deveaux, 9 U.S. 61, 5 Cranch 61, 3 L.Ed. 38.

12 Under the legislation as to banking transactions, the branch can be viewed as a "separate business entity". 12 U.S. C.A. §§ 601–604. Pan-American Bank & Trust Co. v. National City Bank of New York, 2 Cir., 6 F.2d 762, 767; In re Harris, D.C., 27 F.Supp. 480.

The rule is uncontroverted in most jurisdictions that a bank, which receives a deposit, makes a contract that it will pay out the money only upon the order of the depositor [13]. If, therefore, a bank pays money upon the depositor's check bearing a forged endorsement of the name of the payee, the bank is liable therefor [14]. This position is ordinarily justified in legal theory by the presumption that the bank under such circumstances pays out its own money and not the money of the depositor [15]. The depositor, on the other hand, is not required to know the signature of the payee of his check [16]. He may, therefore, receive back the statements of his account, accompanied by cancelled checks with forged endorsements of the respective payees and hold these without examination, and the bank will still be liable to pay him all moneys which it has not disbursed in accordance with his order.

This general rule has been questioned, however, where a trusted employee of a large concern supplies the data upon which the checks are drawn to one of the officers charged with signing the checks and, thereafter, forges the checks which he has theretofore improperly submitted to such an officer. Under such circumstances, some courts will hold that the depositor had no duty at any time with regard to either its employee or the forged endorsements on the checks [17]. Other courts hold there was a duty owed to the public to supervise the employee and there was a further duty to see that checks for amounts which the concern did not owe should not be consistently placed in the hands of the public nor offered to the drawee bank [18]. The better view would seem to be that if such conduct were long pursued, a denial of recovery from the drawee bank could be justified, either on principles of negligence or estoppel.

In this case the court finds that the Interior did not discover within a reasonable time that checks for amounts which it did not owe on payrolls were consistently signed by its responsible officers and, thereafter, forged by its dishonest employee, Crowe, and that thereby defendant and the prior endorsers were misled. The Bank was not guilty of negligence and was not involved in the misconduct of Crowe. It is liable, if at all, solely on the contract implied from the deposit by Interior. Since there is no decision of the state courts upon this point cited, however, no attempt will be made to determine the instant case on this ground.

Irrespective of whether the Bank was liable to Interior, its liability to the insurers presents an entirely different problem. Courts of many jurisdictions, which are entitled to the highest respect, have held that a bank is liable to a surety [19] under circumstances similar in certain phases to those in the case at bar [20]. The con-

[13] Grants Pass & Josephine Bank v. City of Grants Pass, 145 Or. 624, 28 P.2d 879.

[14] Leather Manufacturers' Bank v. Merchants' Bank, 128 U.S. 26, 34, 9 S. Ct. 3, 32 L.Ed. 342; Midland Savings & Loan Co. v. Tradesmen's Nat. Bank of Oklahoma City, Okl., 10 Cir., 57 F.2d 686.

[15] Board of Education of Jefferson Tp. v. National Union Bank of Dover, 196 A. 352, 16 N.J.Misc. 50.

[16] National Surety Company v. President and Directors of Manhattan Company, 252 N.Y. 247, 169 N.E. 372, 67 A. L.R. 1113; Detroit Piston Ring Co. v. Wayne County & Home Savings Bank, 252 Mich. 163, 233 N.W. 185, 75 A.L.R. 1273; Los Angeles Investment Company v. Home Savings Bank of Los Angeles, 180 Cal. 601, 182 P. 293, 5 A.L.R. 1193; William D. Shipman v. Bank of State of New York, 126 N.Y. 318, 27 N.E. 371, 12 L.R.A. 791, 22 Am.St.Rep. 821; Jordan Marsh Company v. National Shawmut Bank, 201 Mass. 397, 87 N.E. 740,

22 L.R.A.,N.S., 250; United States Cold Storage Company v. Central Manufacturing District Bank, 343 Ill. 503, 175 N.E. 825, 74 A.L.R. 811. See England Nat. Bank v. United States, 8 Cir., 282 F. 121.

[17] National Surety Company v. President and Directors of Manhattan Company, supra; Detroit Piston Ring Co. v. Wayne County & Home Savings Bank, supra.

[18] Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85; Defiance Lumber Company v. Bank of California, N. A., 180 Wash. 533, 41 P.2d 135, 99 A.L.R. 426.

[19] It might be doubtful whether these insurers stand in the same position as sureties, but the cause has been argued upon that assumption. This is apparently true, also, in the case of American Central Insurance Co. v. Weller, 106 Or. 494, 212 P. 803.

[20] National Surety Company v. President and Directors of Manhattan Company, supra; Fidelity & Deposit Co. of Maryland v. Fort Worth Nat. Bank, Tex.

trolling factors in these decisions are, usually, the rule that the Bank is absolutely liable wherever it pays out money on a forged endorsement of the payee [21], and, secondly, the alleged principle that a surety is entitled to all the remedies which "the creditor would have against all persons liable for the debt" [22].

These decisions neglect consideration of the fact that the forger is the only wrongdoer in the situation. Likewise, they neglect consideration of the highly equitable nature of subrogation.

However, it is strongly urged that the Oregon Supreme Court accepted the reasoning of these cases in United States Fidelity Co. v. United States Nat. Bank, 80 Or. 361, 157 P. 155, 157, L.R.A.1916E, 610. In that case, an individual had his own deposit in a bank and also an account as guardian for an incompetent. He withdrew all the money from his individual account, but the bank thereafter still honored his individual checks, charging them against the guardianship fund. It was held that the surety on the bond of the guardian, which paid the amount of the defalcation accomplished by the payment of the individual checks, was entitled to recover from the bank. The court say:

"The bank, by its wrongful act in paying out the funds on the private check of another, made it possible for that other to squander the money of the wards, and thus became in effect a joint tort-feasor liable for the resulting defalcation."

Here, if the Bank had knowingly abetted Crowe in his unlawful acts, the situations would be comparable. This decision need not be referred to any principle of suretyship. A bank which claims it has paid money which belonged to Jones upon a check written by Smith is liable to Jones or the assignee of Jones for the full amount of his deposit, in any event.

Indeed, the Oregon court has on the contrary canalized this doctrine as to sureties by strict limitations. In American

Central Insurance Co. v. Weller, 106 Or. 494, 502, 212 P. 803, 805, the court say, with regard to the right of subrogation: "It rests upon the maxim that no one should be enriched by another's loss, and may be invoked wherever justice demands its application, in opposition to the technical rules of law."

Also quoting 25 Ruling Case Law, page 1313, Section 2, it is said:

"'One who has indemnified another in pursuance of his obligation so to do succeeds to, and is entitled to, a cession of all the means of redress held by the party indemnified against the party *who has occasioned the loss.*' [23]

"4. It is unquestionably the general rule that on payment of a loss, the insurer acquires the right to be subrogated *pro tanto* to any right of action which the insured may have against any third person *whose wrongful act or neglect caused the loss* * * *" [23]

The doctrine thus announced carries the important limitations phrased in the italicized portions above [24], which fact is apparently overlooked in many of the cases from other jurisdictions above cited.

The limited application of the principle thus supported by the Oregon Court has been applied in other jurisdictions with variations. The surety has been denied recovery against a third party, (1) because there is an election of remedies where the surety is required to pay the loss, (2) because the primary cause of the loss was misconduct for which the surety bound itself, and no other party innocent thereof should be held responsible, (3) because subrogation can only be applied against the party causing the loss, and not against innocent parties independently liable for the amount of the loss.

An excellent illustration of the first variation of the application of this principle [25] is found in United States Fidelity & Guaranty Co. v. Fidelity National Bank & Trust Co., 232 Mo.App. 412, 109 S.W.

Com.App.1933, 65 S.W.2d 276; Grubnau v. Centennial National Bank, 279 Pa. 501, 124 A. 142.

[21] Grubnau v. Centennial National Bank, supra.

[22] National Surety Co. v. National City Bank of Brooklyn, 184 App.Div. 771, 172 N.Y.S. 413, 415.

[23] Emphasis supplied.

[24] See, also, American Bonding Co. v. State Savings Bank, 47 Mont. 332, 133

P. 367, 46 L.R.A.,N.S., 557; American Surety Co. of New York v. Lewis State Bank, 5 Cir., 58 F.2d 559, 560, 561; Meyers v. Bank of America National Trust & Savings Association, 11 Cal.2d 92, 77 P.2d 1084.

[25] See, also, National Surety Co. v. Perth Amboy Trust Co., 3 Cir., 76 F.2d 87, 90; Midland Savings & Loan Co. v. Tradesmen's Nat. Bank of Oklahoma City, Okl., supra, 57 F.2d 693.

2d 47. There, one Chaney, an employee of Continental, had forged endorsements on certain checks which were cashed by the bank in which Continental had a deposit. The surety company had written a bond against loss for misfeasance by Cheney. With full knowledge of the facts, Continental demanded and received payment of its loss by the surety. The court held thereby Continental had affirmed the act of the bank in paying the money out of the account of Continental, and that the surety took no rights by subrogation or assignment.

This theory of election of remedies is not entirely satisfactory, since it leaves out of consideration the onus of guilt which the surety bound itself by contract to assume. Plaintiffs here assert that surety companies, if such a test were adopted, would require the party insured to bring action against the bank first. The practical answer is that they will not remain in the business long if they attempt such measures.

The courts which adopt the second application of the principle above set out indicate that when the sureties pay the loss created under such circumstances they do nothing more than to satisfy the obligation which they assumed for hire. Public policy requires that when a loss predicated upon dishonesty is paid by surety who has assumed that obligation, no subrogation should follow except against the wrongdoer[26]. This doctrine is exemplified by the leading case of National Surety Co. v. Arosin, 8 Cir., 198 F. 605. In the last cited case, Bourne was county auditor, for whose official conduct plaintiff surety company had made itself responsible. Bourne made up false redemption warrants. Some of these were cashed upon forged endorsements upon National German-American Bank, where the county had a deposit. The court held the bank was not liable since the misconduct of Bourne, for which the surety had made itself liable, was the primary cause of the loss.

There are several cases which in net result hold that where the bond is written conditioned upon the honesty of a person who defaults and the loss is paid by his surety, there can be no subrogation[27]. Criticism has been directed to this doctrine where applied to other than official bonds. However, the consequences are the same. The court believes the principle generally applicable. The wrongdoer should bear the loss. Any surety who has made itself responsible for him should suffer the loss, without recourse.

The third ground is buttressed by cases such as New York Title & Mortgage Co. v. First National Bank of Kansas City, 8 Cir., 51 F.2d 485, 487, [28] 77 A.L.R. 1052. In that case, a loan broker procured issuance by title company of title insurance policies to a loan association guaranteeing the latter against loss by reason of defects in title of mortgagors to real estate covered by certain mortgages. The notes and the mortgages were in fact forged by the loan broker. The checks drawn upon the bank by the loan association were then forwarded. Whereupon the loan broker obtained delivery thereof, forged the names of the supposed borrowers and cashed them. The title company paid the loss to the loan association and brought action against the bank because it had cashed checks on which the endorsements of the respective payees had been forged. The court held that no recovery could be allowed because there were two primary obligations running to the loan association from the title company and the bank, neither of which was a wrongdoer, and that subrogation would not be applied as a remedy. The court says:

"But if there were any doubt as to the soundness of this position, we think it clear that plaintiff is not entitled to invoke the remedy of subrogation, because that right is an equitable one, and is applicable in cases in which one party is required to pay a debt for which another is primarily answerable, and which, in equity

[26] See American Bonding Co. v. Welts, 9 Cir., 193 F. 978, 980, 981; United States Fidelity & Guaranty Co. v. Title Guaranty & Surety Co., D.C., 200 F. 443, 448, 449; Washington Mechanics' Savings Bank v. District Title Ins. Co., 62 App.D.C. 194, 65 F.2d 827, 830; American Bonding Co. v. First National Bank of Covington, 85 S.W. 190, 27 Ky.Law Rep. 393.

[27] American Surety Co. v. Citizens' Nat. Bank, 8 Cir., 294 F. 609; American Bonding Company v. Welts, supra; Stewart v. Commonwealth, 104 Ky. 489, 47 S.W. 332; American Bonding Co. v. State Savings Bank, supra.

[28] See also American Bonding Co. v. First National Bank of Covington, supra; Louisville Trust Company v. Royal Indemnity Company, 230 Ky. 482, 20 S.W. 2d 71.

and good conscience, ought to be discharged by the latter. It is the method which equity employs to require the payment of the debt by him who in good conscience ought to pay it and to relieve him whom none but the creditor could ask to pay."

This identical recognition of the equitable nature of subrogation was also made by the Supreme Court of Oregon in the case of American Central Insurance Company v. Weller, supra, 106 Or. page 507, 212 P. 807, under the following circumstances:

Weller sold an automobile to Miller upon a down payment sufficient to cover among other things cost of insurance and a conditional sales contract. This contract was assigned to a bank and payment guaranteed by Weller, who also took out insurance, named Miller as assured, which insured also against conversion, loss payable to the bank or Miller as their interests might appear. Miller himself thereafter converted the car. The insurer paid the loss to the bank, taking an assignment of the conditional sales contract and the guaranty of Weller and brought action against the latter. The court held that, since the insurer had no contract as to the debt but a primary liability as to the conversion of the car, upon payment thereof the debt which arose on the contract of guarantee was extinguished and that insurer had no rights either by subrogation or assignment. The court says:

"37 Cyc. 370, reads: The right of subrogation, as a general rule, 'is broad enough to include every instance in which one party is required to pay a debt for which another is *primarily* answerable, and which, in equity and good conscience, ought to be discharged by the latter, and is the mode which equity adopts to compel the ultimate discharge of the debt by him who, in good conscience, ought to pay it, and to relieve him whom none but the creditor could ask to pay.' (Italics ours.)

"Weller as guarantor comes within the class that should be relieved under the rule mentioned. No one but the creditor, Ashley & Rumelin, could ask him to pay. When the insurance company paid the $300 on the policy the debt was satisfied to that amount as to Weller, *and could not be assigned.*" 29

If the Oregon courts were confronted with the facts here involved, it is believed the principles announced in the last quoted case would be followed.

The proper field for decision is then furnished by a consideration of the rights acquired by the insurers upon payment of the loss. Interior had authorized certain employees to sign checks. Each of the checks in question was properly signed. But the obligation of the insurers upon their separate contracts was to pay the loss caused by fraudulent conduct, embezzlement, theft or dishonesty of certain employees. The insurers had no responsibility for checks of Interior, even though forged.

The independent liability of the Bank to Interior arose from an entirely different contract, which resulted from the deposit made by Interior. The Bank broke its engagement when it cashed checks which did not bear the endorsements of the respective payees. As respects liability on this contract, it mattered not whether Crowe was an employee of Interior. The Bank had no special engagement as to him. It would have been liable if the endorsement had been forged by an entire stranger.

■ Thus, the liabilities of the insurers and the Bank, respectively, to Interior were entirely diverse. Each was contractual, but each was founded on a different contract. The Bank received consideration for its engagement in the deposit made by Interior. The insurers were paid premiums by Interior for their undertakings. The finding above made, regarding the issuance of apparently valid checks by Interior, should not be disregarded in the consideration of the relative positions of the insurers and the Bank. In order to operate with confidence and with less supervision, Interior had insured itself against the dishonesty of its employees, including Crowe. In reliance on these policies, Interior took less precaution, probably, and the way was open for Crowe to use checks which appeared valid upon their faces to perpetrate fraud upon Interior, the endorsers, the collecting Banks, and the defendant Bank. The insurers made themselves primarily responsible for the defalcation of Crowe. The dishonesty of Crowe was the sole cause of the loss sus-

---

29 Emphasis supplied. See Meyers v. Bank of America National Trust & Savings Association, supra.

tained by anyone. If it had not been for that factor, no loss would have occurred. One should not be entitled to recover from another that which he has paid out in discharging a debt in the performance of his own obligation.[30]

Interior is not entitled to more than one recovery. If the Bank paid now there would be a dual recovery. The surety has paid the loss upon its undertaking, and thus liquidated the debt. This is made clearer by disregarding precedent and looking at realities. In the event the defaulting employee himself had paid the amount of the loss to the Interior, no court would permit Interior thereafter to recover against the Bank. It is held that when the Bank cashed the forged checks it had used its own money. The forger then received the money of the Bank. If he paid the Interior he would have used the money of the Bank, and thereafter Interior would have had no claim against the Bank. Because of his dishonesty and default, the insurers paid money to Interior. This money was paid by the insurers to replace the money belonging to the Bank. Once it came into the hands of Interior, the latter was entitled to call on the Bank solely for the balance of its deposit, less the amount which had been finally paid to it by insurers.

The sole cause of the loss was the conscious dishonesty of Crowe, the only person who benefited by the forgeries of these checks. According to the record, he has made no restitution to anyone. If the Bank is required to pay this money, the chance of recovery from Crowe is slight. If the sureties recover from the Bank, their interest in the matter will be slight. Probably, for a consideration in view of such results the sureties would again insure Crowe. There is no evidence that he has been prosecuted civilly or criminally. He is the wrongdoer. All other parties are innocent. He should bear the loss. But here the insurers agreed to bear the burden for him, if he was guilty of dishonesty. This is exactly the obligation which they assumed for hire.

This situation is brought into highlight by the fact that after they paid the loss, the insurers procured the forger to come into court to testify what he did in order to take advantage of Interior. He cooperated by testifying as to his own wrongful acts.

If recovery is permitted against the Bank, the situation will be prolific of litigation. The defendant can sue the collecting banks, and these can sue Meier & Frank Company and other primary endorsers. Plaintiff suggests that the loss will eventually fall upon the insurance companies protecting some of these concerns. To the court it seems more reasonable to allow the loss to remain on the plaintiff insurers. They guaranteed the honesty of Crowe. They have paid the loss. The burden is resting where it belongs.

Interior had an independent right on contract against the Bank. But its primary right was against Crowe and his insurers. The insurers paid the money for Crowe, and under the principle laid down by the Oregon Supreme Court they have a remedy against Crowe who was primarily responsible.

■ Only Interior could ask the Bank to pay. The latter was innocent of wrongdoing, but had broken its contract. It would be unconscionable and unjust to hold the Bank responsible for the unlawful acts of Crowe. When the insurers paid the loss on the policies, the debt was satisfied. There was nothing which insurers were entitled to recover either on principles of subrogation or by assignment[31]. Neither right nor remedy longer subsisted.

Findings and judgment may be prepared.

---

[30] See Amick v. Columbia Casualty Co., 8 Cir., 101 F.2d 984, 986; Commercial Casualty Ins. Co. v. Petroleum Pipe Line Co., 10 Cir., 83 F.2d 412, 414.

[31] Meyers v. Bank of America National Trust & Savings Association, supra; Louisville Trust Company v. Royal Indemnity Company, supra; American Surety Company of New York v. Lewis State Bank, supra.