[No. 24755. *En Banc.* February 5, 1935.]

DEFIANCE LUMBER COMPANY, *Appellant*, v. THE BANK
OF CALIFORNIA, N. A., *Respondent and Cross-
appellant*, THE WASHINGTON NATIONAL
BANK *et al., Respondents.*[1]

*F. D. Oakley, Henry Elliott, Jr.*, and *Reuben C. Carl-
son*, for appellant.

[1] Reported in 41 P. (2d) 135.

534

*Neal & Bonneville,* for respondent and cross-appellant.

*Guy E. Kelly,* for respondent Puget Sound National Bank.

BEALS, J.—The plaintiff herein, Defiance Lumber Company, a corporation, has been for many years engaged in the manufacture of lumber, operating a large plant in the city of Tacoma. Plaintiff did its banking with defendant, The Bank of California, N. A., and brought this action, praying for judgment against its banker for $5,583.12, being the aggregate amount of one hundred thirteen checks drawn by plaintiff on defendant and paid by the bank on forged endorsements of the names of the respective payees of the checks.

On defendant's motion, The Washington National Bank, a corporation, B. F. Schlesinger & Sons, Inc., a corporation, The National Bank of Tacoma, a corporation, and Puget Sound National Bank of Tacoma, a corporation, were brought in as additional defendants; whereupon defendant filed its cross-complaint against the additional defendants, seeking to recover from them, respectively, in case plaintiff should recover judgment against defendant, so much of plaintiff's claim as was represented by checks originally presented to and paid by such additional defendants on forged endorsements and thereafter transmitted to and paid by defendant as drawee bank. One of the additional defendants made default; the other three appeared and answered, denying liability.

After a lengthy trial to the court, comprehensive findings of fact were made, from which the court concluded that plaintiff was not entitled to judgment against defendant. From a judgment dismissing the action pursuant to the court's decision, plaintiff has appealed. Defendant, The Bank of California, N. A.,

cross-appealed from the ruling of the court denying to defendant conditional judgments in its favor against each of the additional defendants in such amounts, respectively, as defendant contended it should recover in the event that plaintiff should ultimately recover judgment against defendant. The view which we take of the case renders further discussion of defendant's cross-appeal unnecessary. Defiance Lumber Company will accordingly be referred to here as appellant, and The Bank of California, N. A., as respondent.

A brief statement of the facts is necessary to a proper discussion of the questions to be determined. Appellant has been engaged in business as a manufacturer of lumber since 1906. During the years 1927, 1928 and 1929, Mr. L. L. Doud was president of appellant, a Mr. Gange was its general superintendent, and one R. B. Foster, whose dishonesty caused this litigation, was the day foreman of its sawmill and its timekeeper. During the period in question, appellant employed about two hundred fifty men, working in two shifts. Of these, approximately eighty were employed under the direction of Foster.

Prior to November, 1928, appellant's main office was located about two blocks from its plant, at which was located a smaller office used by Gange, the superintendent, Foster, the day foreman and timekeeper, and one Swanson, the yard foreman. In this smaller office was a time clock, upon which the workmen were required to register in and out. Adjacent to the clock were racks, in which the men's time cards (which were punched through the time clock) were kept in alphabetical order. The occupants of the office could readily observe the workmen as they checked in and out, it being a rule of the company that no one should punch the time clock more often than once in the morning and once in the evening of each working day. Each time

card bore the name and number of an individual workman.

Prior to 1928, Foster made out the time cards for new men as they went on the payroll, extended the men's time thereon during their employment, and placed the cards in their proper positions on the racks. Other employees would collect the cards and turn them over to the bookkeepers in the main office, where records were made from which the pay checks were subsequently written. After being prepared in the main office, the pay checks were, at appropriate times, brought to the plant office in sealed envelopes and deposited on the racks in places corresponding to the time cards. It was Foster's duty to inspect the racks and ascertain whether the names and numbers on the pay envelopes corresponded to the names and numbers on the time cards. As the men called for their checks, representatives of the company would observe them to see that each man took only his own check.

Foster, in his position as foreman of the sawmill, was authorized to hire and discharge men for that unit as he saw fit, it being his province to see that the sawmill was at all times supplied with a sufficient crew, and that the men were properly allocated to their respective duties. Although the men were listed under the heading of the particular employment for which they had originally been hired, this designation was often incorrect, as men were frequently changed from one job to another. Unless such change involved a difference in the rate of pay, the designation on the card would remain the same. A natural result of this plan was that the cost statement, which was submitted to the general manager at the end of each month, did not accurately represent the payroll in computing the different unit costs, but simply disclosed the total cost of operation. As timekeeper, it was also Foster's duty

to see that the men listed were actually working. His frequent presence in the vicinity of the time clock and the card rack was necessary, and made it easy for him to manipulate the time cards to his advantage without exciting any suspicion on the part of his fellow employees.

In November, 1928, the main office was moved to the plant, and the two offices were there consolidated. The same general routine, however, was still followed; the greater number of employees thereafter working in the vicinity of the time clock affording additional opportunity for watching the men and enforcing the company's rules. After this office consolidation, Foster no longer extended the men's time on the cards, his duties as timekeeper being also somewhat restricted.

Under this system, manifestly, too much authority was vested in Foster, and he, being ready to cheat his employer, found ample opportunity to do so. His fraudulent operations commenced during the month of November, 1927, when he inserted in the racks a time card bearing the name J. C. Bell, a fictitious person. Every two weeks thereafter, he inserted a new card bearing this name, and in the following July he added another card bearing the name George Osborne. He carried these two cards along until the following April, when he added a third in the name of D. Ferris, and in September, 1929, he added a fourth card in the name of Lee Mitchell. Cards bearing these four fictitious names were carried along by Foster until his fraudulent operations were exposed in December, 1929.

Prior to the consolidation of the offices, it had been a simple matter for Foster himself to punch the time clock twice each day for the dummies for whom he had written cards. The manipulation of the time clock was not so easy after the consolidation in November, 1928.

Thereafter, Foster would come to the office early, before the arrival of the other employees, and would then punch the clock for the fictitious workmen. To check them out evenings was more difficult, but he would generally ask some workman to punch the clock twice, once for himself and once for a dummy, giving some plausible excuse for desiring this to be done. This method, of course, was attended with an ever-increasing risk, but the system, nevertheless, was followed successfully until sometime during December, 1929. Whether or not, in punching the time clock and in other matters connected with this fraud, Foster had any active confederates consciously helping him impose upon the company, is not disclosed by the record.

Foster obtained possession of the pay checks drawn in favor of the nonexistent workmen by abstracting the same from the card rack at convenient times when his acts were not observed. He would then endorse the names of the respective fictitious payees, and cash the checks at the various banks named as parties defendant to this action, or with defendant B. F. Schlesinger & Sons, Inc. Of the one hundred thirteen checks, all but nine were endorsed only with the name of the payee. Nine, in addition to such an endorsement, bore the genuine signature of Foster.

The nine checks upon which Foster endorsed his own name and many of the other checks were cashed at the Puget Sound National Bank of Tacoma, where Foster maintained a personal account. There is some evidence in the record to the effect that Foster brought to this bank persons whom he represented to be the individuals named as payees in the checks and introduced them as such payees, and that thereafter the bank cashed pay checks for these individuals, either for them personally or for Foster in their presence. Foster testified that, in cashing the checks, he was al-

ways alone, and that the different banks honored the checks when he presented them. Examination of the checks discloses that the endorsements were cleverly executed, Foster carrying out a consistent plan in his fraudulent manipulations.

Upon discovery of the thefts in December, 1929, appellant's officers obtained from Foster a complete confession; whereupon respondent was notified, it in turn notifying the other persons who had cashed the checks. No portion of the money fraudulently obtained was ever recovered from Foster. Apparently, the only property which he owned was an automobile of small value, which was turned over to appellant.

The first matter to be determined is, of course, whether or not respondent, The Bank of California, N. A., is responsible to appellant for any of the losses by Foster's dishonesty. Other matters depend upon the determination of this question.

Appellant makes fourteen assignments of error, all based upon findings of the trial court, save the formal assignments alleging error in denial of appellant's motion for a new trial and in the rendition of judgment dismissing the action.

In its answer, respondent set forth six affirmative defenses, alleging first, that appellant was negligent in its method of bookkeeping and in the plan which it followed in drawing and delivering its pay checks; second, that the fraudulent checks were actually delivered to the person to whom appellant intended to deliver them, and that appellant knew, or should have known, that these checks were, from time to time, being delivered to the person who endorsed thereon the names of the respective payees thereof, and that the proceeds of the checks were, in fact, delivered to the person intended by appellant to receive payment thereof; third, that appellant negligently failed to notify the respond-

ent of the fraud within ten days after receipt of the monthly statements furnished appellant by respondent; fourth, that the action was barred by the sixty day statute of limitations; fifth, that recovery upon all checks dated and charged to appellant prior to November, 1928, was barred by the three year statute of limitations; and sixth, that appellant was estopped to recover judgment against respondent because, in issuing the checks which were fraudulently procured, appellant represented that the payees therein named were its employees, and because it failed to notify respondent of the fraud until a long period of time after its discovery, and that, on account of this delay, respondent had lost valuable rights.

The trial court found that appellant was negligent in its method of keeping the roll and time of its employees in the sawmill department and in making up its payroll; that it was also negligent in its method of delivering its pay checks to its employees; and that it had negligently entrusted Foster alone with all matters connected with the employment of help, the keeping of the men's time, the preparation of the data upon which its pay checks were issued, and the supervision of the delivery of the pay checks to the men.

█ █  It is evident that the system used by appellant in keeping the time of its men, preparing its payroll and distributing the pay checks, was poor, and afforded great opportunities for fraud on the part of a dishonest employee. No adequate check was made to ascertain who was actually employed or was working, and the time clock system, as operated, was easily beaten, as the result proved. Appellant issued its regular payroll checks over a period of years, the payees of which were, in fact, non-existent. It intended that these checks be cashed, supposing that the money

had been actually earned by the payees. As the trial court, in its oral opinion, well stated:

"To reimburse itself for the loss sustained by its own mistake, it now asks the Bank of California to pay to it the money used in cashing these checks, claiming the Bank should have discovered what the company itself, with all its knowledge of its employees, failed to discover in making up its payroll."

It is important to remember that the checks with which we are here concerned were not forgeries. They were admittedly regularly drawn and signed by appellant's agents and officers. There is a clear distinction between a forged check and the forged endorsement of a check. The obligation of a drawee bank to its depositor is well nigh absolute, in so far as the depositor's signature to a check is concerned. The drawee's liability in connection with the payment of a genuine check, in so far as the matter of any endorsement thereon is concerned, presents entirely different questions.

The drawer of a check cannot recover from the bank paying the same on a forged endorsement, where the payment was the proximate result of the drawer's own conduct, unless the bank by its negligence has rendered itself liable, in spite of the drawer's negligence. The rule that a bank which pays a check upon a forged endorsement must stand the loss is limited to instances in which the acts of the depositor have not increased the risk lawfully resting upon the bank. The equitable doctrine that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences, applies in many cases. This rule was held applicable by the United States circuit court in *United States v. National Exchange Bank*, 45 Fed. 163; it appearing that the drawer of the check delivered the same to a person whom he believed to be the payee

therein named, this person forging an endorsement on the check, which procured its payment by the drawee. The court of appeals of the District of Columbia, in the case of *Central Natl. Bank etc. v. National Metropolitan Bank,* 31 App. D. C. 391, 17 L. R. A. (N. S.) 520, used the following language:

"It is a principle of natural justice that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences. As the transaction in this case began with Lester, it was his duty to use diligence to ascertain the identity of the party with whom he dealt. Failing to make this discovery, he became the victim of a fraud. The impostor having succeeded in this first and essential step in the practice of the fraud, the next was comparatively an easy one. The bank had a right to believe that Lester had acted with full knowledge of the party to whom he gave the check for the money, and its duty to him was discharged when it satisfied itself that the payment was intended to be made to the party who presented it."

The supreme court of Ohio, in the case of *McHenry v. Old Citizens' Nat. Bank,* 85 Ohio St. 203, 97 N. E. 395, 38 L. R. A. (N. S.) 1111, in denying relief to the drawer of a check as against the drawee bank, held that, on the facts shown, relief might be denied upon one of two grounds: First, that it did not appear that the name of the person to whom the check was paid was not the name of the payee therein named; the other being the rule that, where two innocent persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence and commits the first oversight must bear the loss, the court holding that the plaintiff was estopped by his own lack of caution to demand payment of the amount of the check.

In Brady on Bank Checks, after calling attention to the general rule that a bank paying a depositor's check

on a forged endorsement cannot charge the check against the drawer's account, the author refers to the rule that a depositor may be guilty of such negligence as will preclude him from holding the drawee bank responsible in the event that his check is paid on a forged endorsement (pp. 250-1). Manifestly, as stated in the text cited, no specific rule can be laid down as to just what conduct on the part of the drawer of a check will constitute negligence sufficient to preclude him from holding the drawee bank liable for paying his check upon a forged endorsement, each case depending upon its own circumstances. The case of *Weisberger Co. v. Barberton Savings Bank Co.*, 84 Ohio St. 21, 95 N. E. 379, 34 L. R. A. (N. S.) 1100, is cited as supporting the text. In that case, the court held that the drawer of a check, intended to be delivered to a payee in New York, but mailed by error to another city where it came into the possession of a person having the same name as the payee, who endorsed the check and collected the money, could not recover from the bank, the fraud having been made possible by his own negligence. In this connection, the text (citing copious authority) calls attention to the rule that an endorsement made with intent to defraud, by a person having the same name as the payee of the check, is, in law, for some purposes, as much a forgery as though the names of the persons differed.

In the text cited, questions arising in connection with the liability of a bank which pays a check endorsed by an impersonator in the name which he has assumed for the purposes of fraud are considered, and it is stated that, by the weight of authority, such an endorsement is not a forgery, and the drawee bank is protected in paying thereon. The text continues:

"In these cases the indorsement cannot be regarded as a forgery so as to render the drawee liable to the

drawer because the drawer intends the check to be indorsed and negotiated or collected by the person with whom he deals and to whom he delivers the check. The impersonator is guilty of a crime, but the crime is not that of forgery. It is rather an obtaining of money under false pretenses.

"The liability of the drawee bank is the same whether the person impersonated is a person in actual existence or a person existing only in the imagination of the impostor, created by him for the furtherance of his own wrongful ends." Brady on Bank Checks (2d Ed.), p. 275.

In 3 R. C. L., p. 544, the doctrine is explained as follows:

"Where the drawer of a check has dealings with an impostor who assumes a false name, and the check is intended for the person with whom the drawer is dealing, payment of the check by the bank to such impostor, or on his indorsement, will, according to the better view, be authorized and binding upon the depositor. It is a principle of natural justice that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences. As the transaction in such a case begins with the depositor, it is his duty to use diligence to ascertain the identity of the party with whom he deals. The bank has a right to believe that the depositor has acted with full knowledge of the party to whom he gave the check for the money, and its duty to him is discharged when it satisfies itself that the payment was intended to be made to the party who presented it. Also in such a case the intention with which the drawer issued the check has been carried out. The person has been paid to whom he intended payment should be made. There has been no mistake of fact, except the mistake which he made when he issued the check, and the loss is due, not to the bank's error in failing to carry out his intention, but primarily to his own error, into which he was led by the deception previously practiced upon him. It seems difficult to distinguish upon principle a case where the check or draft is mailed pursuant to communications from the impostor and delivered to him through the

mails, from a case where the check is delivered to the impostor in person by the drawer, or the latter's agent.''

Cases determining different phases of the questions here under discussion are numerous. It is, of course, apparent that each case depends upon its own facts, and that many are found close to the border line which are difficult of determination.

In fixing liability as between two innocent parties, this court, in the case of *Jamieson & McFarland v. Heim,* 43 Wash. 153, 86 Pac. 165, held the drawer of a draft responsible for a loss because of lack of diligence in the issuance thereof. The rule that, where one of two innocent parties must suffer, the loss must fall on him upon whom rests the greater responsibility for the circumstances which occasioned the wrong, has been recognized by this court in cases too numerous to cite.

In the case of *First National Bank of Philadelphia v. Farrell,* 272 Fed. 371, 16 A. L. R. 651, the circuit court of appeals, in determining questions arising between a depositor and his bank, said:

''The depositor owes the bank the further duty of properly supervising the conduct of his agent in the examination of the bank's statements especially where it appears that the agent committing the frauds had an interest in concealing them.''

This rule is important here as indicating the responsibility of appellant in failing to maintain proper check on its employees and on the manipulation of its time clock and time cards.

The supreme court of Iowa, in the case of *Erickson Co. v. Iowa Nat. Bank,* 211 Iowa 495, 230 N. W. 342, reversed a judgment of the trial court rendered, as matter of law, in favor of plaintiff, the depositor, and

held that the questions of fact as to the negligence of the parties should have been submitted to the jury. In the course of its opinion, the court said:

"It is also manifest upon this record that, if the payee in each check had been genuine, there would have been no false indorsement and no negotiation of the check. It is, therefore, apparent that the system devised and put in use by the plaintiff-corporation, and participated in and relied on by the drawee-bank, broke down in the very office of the corporation, not through any weakness of the system, but through the failure of the corporate officers to observe its requirements."

The court held that, in signing payroll checks and placing them in course of distribution, the drawer represented that the checks were issued on its regular payroll, and that the payees therein named were "actual present employees of the corporation." While the matter of ultimate responsibility was not determined in the case cited, the language of the court is in point in considering the questions here to be decided.

In the case at bar, appellant is subject to even more criticism, as its officers were negligent, not only in failure to see that its regulations were carried out, but also in placing in operation a system which may be said to have invited the fraudulent operations of its foreman and timekeeper.

In the case of *Cureton v. Farmers' State Bank,* 147 Ark. 312, 227 S. W. 423, the supreme court of Arkansas held that the drawer of checks payable to A. J. Carmon, who delivered the same to H. V. Carmon, believing him to be the payee named therein, could not recover from the bank amounts paid on the checks on forged endorsements written thereon by H. V. Carmon. The case cited was followed by the Arkansas court in the later case of *Missouri Pac. R. Co. v. Cohn*

*Co.,* 164 Ark. 335, 261 S. W. 895, the court holding the drawer of a check estopped

". . . by its own lack of caution from denying liability on the check which it issued and put in circulation by delivering it to a person intended by it as the payee of the check, although he turned out to be an impostor."

The supreme court of California, in the case of *Ryan v. Bank of Italy,* 106 Cal. App. 690, 289 Pac. 863, held the better rule to be that, where a check is delivered to an impostor as payee, in the belief that he is the person to whom or upon whose endorsement the check will be paid, the endorsement by such impostor is not a forgery, because the drawer of the check intends it to be endorsed by the person to whom he delivers it, and in such cases the drawee bank is protected. It was held that, in connection with the matter of negligence, a question was presented to be determined by the trier of the facts.

The supreme court of Colorado, in the case of *Boatsman v. Stockmen's National Bank,* 56 Colo. 495, 138 Pac. 764, 50 L. R. A. (N. S.) 107, quoting from *Crippen, Lawrence & Co. v. American National Bank,* 51 Mo. App. 508, used the following language:

"It has been ruled, too, that when both parties to a transaction are innocent, and the loss must fall upon one, it should be upon the one who in law most essentially facilitated the fraud. *Stout v. Benoist,* 39 Mo. 281 [90 Am. Dec. 466]. And so it has been held in respect to two persons equally innocent, where one is bound to know and act upon his own knowledge, and the other has no means of knowledge, there is no reason for burdening the latter with the loss in exoneration of the former, or if both are equally innocent and equally ignorant, the loss should remain where the chances of business have placed it."

Appellant cites many authorities which it contends

support its contention that the judgment appealed from should be reversed. Some of these authorities support appellant's position; others, we believe, are readily distinguishable, either on the facts or on the law.

Many questions somewhat similar to those now under discussion have been considered by the courts, and many different conclusions have been reached thereon. The rules of law applicable are necessarily general in their nature, the difficulty being to place the facts of each particular case under the proper governing principles.

In the case at bar, appellant was conducting a large business of many years' growth. It had, of course, complete control over its own affairs, and could establish such checks and balances in matters in connection with its employees and its payroll as it thought fit. The system which it adopted was manifestly poor. In carrying out this system, appellant's execution was even more careless than its judgment in adopting the same. Appellant permitted its employee Foster to pad its payroll for over two years, during which period appellant regularly issued its payroll checks, payable to fictitious persons, and permitted Foster to obtain possession of these checks and procure from respondent payment thereof. Under the rule of comparative innocence, such a course of conduct clearly prevents appellant from recovering judgment in this case.

With the findings of the trial court, we are, generally speaking, in accord. We are clearly of the opinion that appellant, by its careless and negligent conduct of its own business, permitted its own employee to perpetrate upon it a gross fraud, and that it cannot now recoup its losses by passing the burden thereof to respondent. Appellant set up the machinery which resulted in the loss, itself took into its employ the man

who stole its money, continued him for a long period of time in a position of trust and authority, failing to observe, as we view it, the slightest care to see that it was protected against such fraud as was, in fact, perpetrated, either by some reasonable check of its employees, by adequately guarding its time clock or its time cards, or by maintaining an adequate system of accounting by which any such loss as that which occurred would have been avoided.

The conclusion which we have reached upon the issue hereinabove discussed renders it unnecessary to consider any other of the questions presented.

The judgment appealed from is affirmed.

MAIN, HOLCOMB, BLAKE, and GERAGHTY, JJ., concur.

STEINERT, J. (dissenting) — The majority opinion holds that the appellant was negligent, as a matter of fact, in the operation of its business, and that such negligence was the proximate cause of the loss. I do not assent to either of these conclusions.

If the appellant was guilty of negligence in the operation of its business, it must have been either because it reposed confidence in Foster, or else because it permitted him to exercise too wide a range of authority.

In my opinion, it can not be regarded as negligence for an employer to repose confidence in a trusted employee. Foster first became connected with the mill in 1924, and because of his ability and apparent integrity, was promoted successively until he became foreman in 1926. Until the discovery of his forgeries, he had never been suspected of any disloyalty or wrongdoing. In every business, no matter how large or how small it may be, confidence commensurate with the duties involved must necessarily be reposed in some one. No business could continue if it operated on the theory that every employee must be distrusted.

I rather assume, however, that the position of the majority is that the appellant permitted Foster to exercise too wide a range of authority. In this connection, the opinion states that

"Appellant permitted its employee Foster to pad its payroll for over two years, during which period appellant regularly issued its payroll checks, payable to fictitious persons, and permitted Foster to obtain possession of these checks and procure from respondent payment thereof."

I do not suppose that, by this language, it is meant to be inferred that appellant had knowledge that Foster was doing those things, or that appellant gave its consent thereto. There is nothing in the record to justify any such inference.

Now, it is true that Foster employed many of the men, allocated them to their work, oversaw them in their work, extended their time upon the cards and saw that the cards were placed in proper position in the racks. Is there anything unusual about that? It seems to me that those duties are the very duties which one in Foster's position would be expected to perform. It is said that he was permitted to be about the card racks, thus enabling him to abstract the checks. But it is conceded that originally the superintendent and the yard foreman were in the same office and could easily observe those going to the racks, and that later, upon the consolidation of the two offices, the whole office force could likewise observe those approaching the racks. It is conceded that there was a strict rule that no employee should punch the time clock for any one other than himself. Was it negligence for the company not to have some one to spy upon each and every occupant of the office whenever he approached the time clock and racks, even though his duties compelled him to go there? I do not think that, simply because a

trusted employee ultimately went wrong, it can be said posthumously that it was negligence for the company to allow him to do it.

But I do not wish to draw too fine a distinction upon the facts or the inferences that may be drawn therefrom. Assuming that the company's system was weak and that its weakness led Foster to take advantage of it, I still think that, upon the law applicable to the facts, the appellant is entitled to recover.

The majority appear to rest the decision largely upon the difference between forged checks and forged endorsements. There is a difference between the two, it is true. But the difference is simply a matter of time. The forgery of a check is as of the time of the issuance of the check. The forgery of an endorsement usually occurs later. In either event, of course, if a payment by the bank is the proximate result of the drawer's own negligence, the latter can not recover unless the bank, by its own negligence, has rendered itself liable despite the drawer's negligence. The majority admit this to be true with respect to forged endorsements.

The question then simply comes down to this: What is the bank's duty when a check is presented to it for payment? The answer has been definitely determined by practically a uniform current of authority. The relation between a bank and its depositor is that of debtor and creditor, out of which relation arises the duty of the bank to disburse the money standing to the depositor's credit only upon his order and in accordance with his directions. When, therefore, a check drawn by a depositor, payable to order, is presented to a bank by one claiming under an ostensible endorsement by the payee, the bank must, at its own peril, ascertain the genuineness of the endorsement; the depositor has a right to assume that the bank will ascertain that the endorsement is genuine. A forged en-

dorsement passes no title to the check. Only when the bank is *misled* by some negligence or other fault of the drawer can it escape liability. Michie on Banks and Banking (5th Ed.), §§ 276, 277a, pp. 506-512; Brady on Bank Checks (2d Ed.), p. 246, §§ 160 *et seq.*

In *Goodfellow v. First National Bank,* 71 Wash. 554 (559), 129 Pac. 90, 44 L. R. A. (N. S.) 580, it is said:

"The law imposes upon the bank on which a check is drawn payable to a certain person or order the duty of ascertaining the identity of the person therein named as payee; and it is only when the bank has been misled by some act of negligence or other fault of the drawer, that it will be justified in making payment of the check to any other than the person named therein as payee. We know of no authority against this proposition. In support of it, see: [list of cases cited]."

See, also, *Los Angeles Investment Co. v. Home Savings Bank,* 180 Cal. 601, 182 Pac. 293, 5 A. L. R. 1193.

It is said that the bank was misled by appellant's own negligence, as found by the trial court. By the great weight of authority, the rule is that the negligence of the depositor which will relieve a drawee who cashes a check on a forged endorsement must be such negligence as relates to the forgery itself, or its detection, and not merely to a mistaken or inadvertent issuance of the check. Stated in another way, the negligence of the drawer must be the proximate cause of the forgery, and not merely the circumstance under, or the means by, which the check comes into the possession of the forger. The negligence of the drawer is immaterial unless it proximately affects the conduct of the bank in the performance of its duties. *American Sash & Door Co. v. Commerce Trust Co.,* 332 Mo. 98, 56 S. W. (2d) 1034; *Wussow v. Badger State Bank,* 204 Wis. 467, 234 N. W. 720, 236 N. W. 687; *McCornack v. Central State Bank,* 203 Iowa 833, 211 N. W. 542, 52 A. L. R. 1297; *St. Paul v. Merchants National Bank,* 151

Minn. 485, 187 N. W. 516, 22 A. L. R. 1221; *Shipman v. Bank of State of New York,* 126 N. Y. 318, 27 N. E. 371, 22 Am. St. 821, 12 L. R. A. 791; *U. S. Cold Storage Co. v. Central Mfg. Dist. Bank,* 343 Ill. 503, 175 N. E. 825, 74 A. L. R. 811.

The case of *American Sash & Door Co. v. Commerce Trust Co., supra,* decided in December, 1932, is almost a parallel case to the one at bar. The facts there were strikingly similar to those here. After a very thorough review of many cases upon the subject, it announces and affirms the rule which I have just adverted to. That case has since been reviewed with favorable comment in Brannan's Negotiable Instruments Law (5th Ed. Beutel), p. 188.

In this case, it was not the negligence of the appellant in the issuance of its checks that was the direct and proximate cause of the loss. It was the negligence of the respondent in failing to ascertain the genuineness of the endorsement that caused it. Foster had no authority from the appellant to present its checks for payment, much less to sign the names of the payees therein. Some of the checks were cashed at the bank of one of the defendants in which Foster had a personal account. That bank evidently relied on Foster when it cashed those checks. To him, therefore, that bank should be required to look. As to those checks, therefore, it is now a matter entirely between the two banks.

On the other hand, the greater number of checks were cashed at respondent's bank, where Foster was not known at all. It was respondent's duty, then, to find out who he was, or at least to find out whether he was the payee named in the check or the person whose signature was endorsed thereon. Had respondent taken the precaution which the law requires a bank to take, it would have learned that Foster was not the

payee or endorser at all, and hence, it would not have been called upon to cash the checks. It was the duty of the bank, at its peril, to ascertain whether the endorsement was genuine. Had the actual payees named in the checks presented them to respondent, and been paid on their endorsement, an entirely different question would here arise.

The rules already announced apply with equal force in a case where the check is payable to a fictitious payee, and the drawer in good faith believes that the payee is a real person.

"The rule that a bank paying a depositor's check on a forged indorsement is liable to him, unless the payment was the proximate result of his conduct or negligence, applies to a check drawn in favor of a fictitious payee, whom the drawer in good faith and without fault believes to be a real person. The payment of such check cannot operate as payment of any part of the bank's debt to the depositor. The bank is not excused by paying it to the fraudulent holder, unless it takes precautions to determine whether the indorsement is genuine, which involves the ascertainment of identity, and the genuineness of the signature. The duty of a bank to use due diligence in identifying the payee of a check is not changed by the forgery of a check so as to make it payable to a fictitious payee. But if the drawer knows that the payee is a fictitious person the check is considered as payable to bearer, in which case payment to any holder is authorized and the bank is under no duty to ascertain the genuineness of the indorsement." 5 Michie on Banks and Banking, § 277d, p. 516.

See, also, cases above cited.

The evidence in this case is conclusive to the effect that appellant believed that it was issuing its checks to existing persons in its employ.

I think that the appellant should be permitted to recover, except upon so much of its claim as represents

the checks paid prior to November, 1928.  I therefore dissent.

MILLARD, C. J., MITCHELL, and TOLMAN, JJ., concur with STEINERT, J.