P.R. TOBACCO MARKETING ASSOCIATION, Plaintiff and Appellee, *v.* PORTO RICAN AND AMERICAN INSURANCE COMPANY, Defendant and Appellant; BANCO POPULAR DE PUERTO RICO and BANCO DE PONCE, Third-Party Defendants and Appellees.

No. R-68-331.  Decided February 9, 1972.

*Agraít Oliveras & Otero* for appellant. *Amancio Arias Cestero* for appellee. *Baragaño, Trías, Saldaña & Francis* and *Clara López Baralt* for Banco Popular de Puerto Rico. *Dubón & Dubón* and *A. Torres Braschi* for Banco de Ponce.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question raised in this case requires that it be determined which of the parties should assume the loss of $8,435 resulting by reason of the forgery of appellee's checks made by Raúl Ortiz Ramón, an employee of same. The Banco de Ponce paid and endorsed said checks for payment and to be credited in favor of Banco Popular, the latter having charged the amounts of said checks against the appellee's account. When the fraud was discovered, appellee had to reimburse the sum of these checks to the crop-financing debtors against whose accounts they had been charged.

When the loss in question occurred, appellee sued appellant for the reimbursement of said loss pursuant to the surety bond in force between them. The appellant then filed complaint against third party, against Banco de Ponce, and Banco Popular alleging that the amount of said checks was erroneously and/or negligently paid by the branch at Cayey of the Banco de Ponce which in turn received payment for same from the Banco Popular de Puerto Rico after having

endorsed each one of them; that both banks are responsible for the claim brought against them by appellee or for the amount which definitively appellant may be bound to pay. The Banco de Ponce in its answer, besides denying the facts, alleged as an affirmative defense, that the losses in question were the result of appellee's own negligence since more than 7 months elapsed before discovering and notifying the forgeries despite having received during that period monthly statements from the Banco Popular. The Banco Popular in its answer denied the facts and as defense adduced the same one alleged by the Banco de Ponce. Besides, it alleged that the checks in question were issued without appellee's intention to deliver them to the persons in whose favor they were drawn and thus, they were tantamount to instruments payable to bearer not requiring endorsements for their payment. Furthermore, the Banco Popular filed a cross-claim against the Banco de Ponce in which it alleged that, in the first instance, the checks were presented and paid by the Banco de Ponce and that if the complaint against third party were granted, the Banco de Ponce, in accordance to the guarantee contracted in the endorsement of said checks, must relieve the Banco Popular of its liability as to each and every one of the said checks.

The essential facts in the case, as summarized in part by the trial court, are the following:

"1.—The plaintiff, the Puerto Rico Tobacco Marketing Cooperative Association, during the period to which this action refers, maintained open bank accounts at the Banco Popular de Puerto Rico and at the Banco de Ponce. The plaintiff made deposits of money to its account at the Banco Popular so as to draw against them through checks or payment orders which it issued through agents authorized for those purposes. The checks corresponding to the Cayey area were paid through the branch of the Banco de Ponce in that town, which in turn endorsed the checks for payment or to be credited in favor of Banco Popular de Puerto Rico.

"2.—At the time during which the events which gave rise to this action occurred, a contract was in force between the parties binding the defendant to answer to the plaintiff for losses which the latter might suffer as a consequence of dishonest acts on the part of any of its employees, including: forgery, fraud, false pretenses, and others.

"3.—Between November 1956 and July 1958, the plaintiff, having sufficient deposits in the bank accounts referred to, drew against them over 60 checks or payment orders, payable to members of the cooperative (farmers in Cayey devoted to tobacco growing). All these drawings were honored by the mentioned banking institutions.

"4.—The aforesaid checks were drawn by the plaintiff under the signatures of its President and Secretary-Treasurer . . . . All the subscribers were authorized by the plaintiff to do said drawings and their signatures appeared duly registered at the banks.

"5.—Raúl Ortiz Ramón, the person in charge of the plaintiff's office in Cayey, through false and fraudulent simulations obtained from the mentioned officers of the plaintiff the issuance of the payment orders referred to, these officers believing in good faith that they were dealing with actual loans or advance payments requested by members of the plaintiff; while the truth was that Ortiz Ramón had simulated the applications and had prepared fraudulent listings in order to obtain the said checks, which he personally cashed and used for his own benefit.

"6.—Raúl Ortiz Ramón, being aware that the beneficiaries of the expressed checks were not going to receive their worth and ignored their drawing—taking advantage of the fact that they were bona fide members or associates of the plaintiff association—contrived the described scheme for the deliberate purpose of defrauding the plaintiff. In all the checks Raúl Ortiz Ramón forged the beneficiaries' signatures and then endorsed them with his signature so as to obtain payment from the bank. Between the plaintiff and the banks referred to, it had been decided that drawings endorsed by Raúl Ortiz Ramón were to go through. The amount of the said checks, once they were paid to Ortiz, were charged against the respective accounts of the plaintiff.

"7.—The said Raúl Ortiz Ramón pleaded guilty and admitted all the facts charged against him in the 45 counts of the information for forgery; and on February 17, 1961 the Court sentenced him to serve a penalty of from 1 to 5 years in the penitentiary, sentence which was suspended. (No charges were preferred for some of the forged checks because criminal action had prescribed.)"

The sum total of the checks in the case were charged by the Banco Popular de Puerto Rico against appellee's account. As the latter had charged against the account of each receiver, as its financing debtor, the amount of the corresponding check, when the fraud was discovered appellee had to reimburse to them what had been thus charged, through the proper credit in their accounts with the appellee.

Ortiz Ramón was accused and pleaded guilty to the forgery of those checks as to which the criminal action had not prescribed. He was sentenced to serve from 1 to 5 years in the penitentiary but the sentence was suspended. Ortiz Ramón has deposited in the Superior Court the amount of $1,500 for appellee's benefit.

In view of the foregoing facts the trial judge concluded that the checks in question are "tantamount to instruments 'to bearer', as such, they were negotiable merely by delivery," so that the alleged endorsement of the same by Ortiz Ramón was unnecessary and superfluous; that the forgery of the endorsement had no legal effect at all. By virtue thereof it ordered appellant to pay to appellee the sum of $8,435 and $1,000 for attorney's fees and dismissed the third-party complaints, ordering appellant to pay $1,000 for attorney's fees to each one of the banks plus the costs and legal interest upon both sums from the date on which the complaint was filed.

Appellant assigns that the checks in question were "instruments payable to order" it being thus necessary, besides its delivery, the valid endorsement of the holder; that the court,

upon concluding that the forgery of the endorsements had no legal effect, particularly in this case in which each forged endorsement appeared countersigned by Ortiz Ramón, duly authorized for this type of action by appellee, relied on an agreement to this effect between appellee and the banks set forth in the above finding of fact number 6; that said verbal agreement was one of mere identification so that it did not have the effect of converting the checks in instrument of payment to bearer. The appellant challenges the existence of said agreement; it maintains that the endorsement by Ortiz Ramón himself did not constitute a guaranty of the validity of the endorsement of the person to whom each check was drawn and whose endorsement was forged by Ortiz Ramón.

By virtue thereof, appellant argues that:

"The checks were improperly charged against the account of the plaintiff by the drawee bank. Plaintiff has not established, therefore, that it incurred a *loss* which is the risk covered by the surety bond." (Italics in the original.)

"If found entitled to recover under the surety bond, the petitioner is entitled in turn to repeat against the Banco Popular which is the drawee bank, any sum which finally petitioner may be bound to pay to plaintiff in subrogation of the latter's rights. *Maryland Casualty Co.* v. *Banco Popular, supra;* and against the Banco de Ponce."

The first question to determine is whether the Banco de Ponce cashed those checks in accordance with the understanding reached between Mr. Collazo, manager of the branch of that bank in Cayey, and Mr. López Obén, chief of appellee's office in Cayey. In the second place, we must determine, in case the checks were cashed in violation of the said understanding, whether appellee was negligent in informing the fraud promptly upon receiving the monthly statements from the Banco Popular. Lastly we must decide whether appellant may hold the banks referred to liable for the loss resulting from the fraud in question.

The evidence on the agreement between Mr. Collazo and Mr. López Obén arises from the testimony of the former. We copy from the record hereinafter the pertinent part of Mr. Collazo's examination.

"Q. Did you have, as manager, the opportunity to talk with any of the directors of the Tobacco Marketing?

A. Yes, sir.

Q. In relation to these checks of borrowers?

A. Of course, I had several conversations.

Q. Explain to the Court on the occasions you talked about that?

A. I am going to explain, really, when the checks, which the borrowers brought to cash, were not brought by persons known to the tellers, then when the person presented the check at the window, the teller did not know him and he asked the man if there was a person to identify him for cashing the check; the man therefore started to look around, he did not find the known person, since they were borrower farmers from Cayey, from Cidra, since that is in the country, they returned to the office and around twelve were back here, already annoyed and they did not want to cash the checks, that was what happened . . . .

WITNESS:

A. Well, truly, I found out that the teller did not want to cash the check because the person was not known to him, a check for Forty-three and Seventy-three or more, he did not cash it, the holder being unknown to him. Naturally he did not cash it, as instructed. *I tell you very naturally, you get us a person to identify those persons, then we cash it.*

Q. Did you go to the local office of the Marketing to see the Director?

A. Alberto López Obén, chief of the office there and I agreed, he was there that day and we agreed, that *I would select this fellow Raúl Ortiz Ramón to identify the persons who would go to cash the checks.*

WITNESS:

Q. How was this agreement with the tellers implemented?

A. They received instructions, they were informed of the agreement I had with the Cooperative regarding all checks of borrowers of the Cooperative if the holders were unknown, there

were other checks that could be cashed since the holders were known, now there was a number of checks brought by unknown holders, then they *would be cashed if they had for identification the signature of Raúl Ortiz Ramón.*

Q. How did this actually function?

A. The agreement was put into effect.

ATTORNEY ARIAS CESTERO:

Q. What was the procedure?

WITNESS:

A. The procedure?

Q. I mean, witness, how was the person going to be identified?

A. Because all the checks were signed by Raúl Ortiz Ramón.

Q. If Raúl signed the borrowers' checks they did not have any problem?

A. No, sir.

Q. The borrowers had to appear personally at the window to sign in the presence of the teller and Raúl Ortiz Ramón as well?

A. Well, up to the tellers, there were instances in which the holders would come and identify themselves there, besides, with the signature of Raúl Ortiz Ramón they would be cashed.

Q. The normal thing was in the presence of the employee?

A. Yes, sir, in the presence of the teller or they came with the signature of Raúl Ortiz Ramón.

Q. All the verification by Raúl was to identify the person?

A. The tellers did it.

JUDGE:

*In other words, if they carried the signature of Ortiz Ramón no further identification was required from the person?*

WITNESS:

A. That's it.

Q. The agreement was that when they carried the signature of Ortiz Ramón no identification was required?

A. That was the agreement.

Nothing else, Your Honor." (Italics ours.)

From the above evidence it results that for the purpose of cashing the checks issued by appellee in favor of the farmers under crop lien, if they were not known at the bank, they had to bring their checks personally to the bank accom-

panied by Ortiz Ramón, and then, there, in the presence of the teller of the bank, the payees would endorse the checks and Ortiz Ramón would identify those payees signing his name after that of the payees.

The orders given to the tellers of the Cayey Branch of the Banco de Ponce, that (1) when "the persons were not known, then bringing the signature of identification of Raúl Ortiz Ramón they would be cashed"; and (2) "that they could be cashed because they had instructed . . . provided Raúl Ortiz Ramón signed the checks or they were signed by him as beneficiary of the checks," did not fit with the clear under-standing of the parties which assumed that the payees would come to the bank accompanied by Ortiz Ramón and they would endorse the checks and Ortiz Ramón would identify each payee signing his name after that of the payee, all in the presence of the teller.

The fact that Ortiz Ramón was well known and because of the trust deposited on him by the branch in Cayey of the Banco de Ponce, it became customary to cash the checks drawn by the appellee in favor of the farmers financed by the former, when Ortiz Ramón presented them supposedly endorsed by the payees even though he was not accompanied by them. Then Ortiz Ramón would give as excuse for the absence of the payees, and it would be accepted, that the payees had been to the bank and were annoyed because they had not wanted to cash the checks, and had gone to Ortiz Ramón's office; on other occasions he would give the excuse that the payee was sick. Such trust and informality in the process of cashing the checks reached the point that the tellers at the Banco de Ponce, acquainted as they were with Ortiz Ramón's signature, did not notice that the endorsements of the checks by the payees appeared made in the same ink and with a very similar handwriting as that of Ortiz Ramón.

From the foregoing we conclude that the officers of the Banco de Ponce in Cayey were negligent in cashing said

checks to Ortiz Ramón in open violation of the terms and better practice to follow pursuant to the agreement on this matter, reached by appellee and Banco de Ponce.

We have no doubt that that practice made it easier and possible for Ortiz Ramón to commit the fraud in question.

■ Since Ortiz Ramón's knowledge that the endorsements of the payees on the checks were fraudulent, cannot be attributed to appellee, those checks did not constitute instruments payable to bearer pursuant to subd. 3 of § 362 of the Commerce Code in force (19 L.P.R.A. § 10(3)). On the contrary by way of illustration, the drawing of $4,737.54 against the Banco de Ponce by the appellee, which appeared signed by Lebrón Obén and Ortiz Ramón, as officers of the appellee authorized to do so by it, was an instrument payable to bearer because Ortiz Ramón's knowledge that he had forged the signature of Lebrón Obén in this withdrawal was attributable to the appellee. *E.M.L. Insurance Co.* v. *Banco Popular*, 91 P.R.R. 626 (1965).

■ The checks signed by appellee's President and Secretary-Treasurer are instruments payable to order. They required the endorsement of the payee and its payment by the bank was an undue payment inasmuch as the endorsements had been forged. *Maryland Casualty Co.* v. *Banco Popular*, 92 P.R.R. 320, 329–331 (1965).

■■ The obligations of banks to their depositors arise from the contractual relations existing between them. The bank is liable to its depositor when it makes payments in violation of the latter's instructions. A bank cannot acquire any right against a depositor when it has paid a check in which the depositor's signature has been forged, unless the depositor is precluded from alleging the forgery or want of authority in its defense. *Portilla* v. *Banco Popular*, 75 P.R.R. 94, 108, 110–111 (1953); *Maryland Casualty Co.* v. *Banco Popular, supra* at 330; *Glen L. Martin Co.* v. *Fidelity*

*Baltimore N.B.V.T. Co.*, 145 A.2d 267 (Md. 1958); *Defiance Lumber Co.* v. *Bank of California*, 41 P.2d 135 (Cal. 1935).

■ Subrogation transfers to the surety who pays in lieu of another the latter's rights and defenses as to the satisfied credit and remains subject to the defenses which the one who originally satisfied the credit through the presentation of fraudulent instruments may have. Civil Code, § 1166 (31 L.P.R.A. § 3250); III Castán, *Derecho Civil Español* 284; *United States* v. *Munsey Trust Co.*, 332 U.S. 234, 242 (1947); *Hartford Acc. I. Co.* v. *First Nat. B. & T. Co. of Tulsa, Okl.*, 287 F.2d 69 (10th Cir. 1961); *Bank of Fort Mill* v. *Lawyers Title Insurance Corp.*, 268 F.2d 313, 317 (4th Cir. 1959).

■ The record establishes that Ortiz Ramón not only forged the payees endorsement on the checks but also simulated the applications and the listings of the loans so that the appellee could not become aware of, and stop, the fraud in question upon verifying the cancelled checks returned by the Banco Popular. There was no evidence that it could have discovered said fraud even at the end of each harvest when the loans corresponding to the harvest were liquidated. Therefore, the defense adduced by the Banco de Ponce, based on the rule adopted in *Portilla* v. *Banco Popular*, *supra* at 111–112, that appellee was negligent in not discovering and notifying the forgery promptly, does not lie.

In view of the foregoing, the judgment granting the complaint against third party and the cross-claim must be modified holding the third-party defendants liable for reimbursing appellant the amounts of the judgment rendered against it in this case and which it may have paid to appellee, plus its costs, and $1,000 for attorney's fees, and the Banco de Ponce for reimbursing the Banco Popular all or any part of the above sums it pays, and furthermore, the Banco de Ponce must be ordered to pay the Banco Popular costs and $1,000 for attorney's fees. Thus modified, the judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Martínez Muñoz took no part in the decision of this case.